**G.L., An infant, By and Through his Next Friend, et al., on their own behalf and on behalf of all others similarly situated, Plaintiffs,**

v.

**Gary STANGLER, et al., Defendants.**

**No. 77–0242–CV–W–1.**

United States District Court,
W.D. Missouri,
Western Division.

Dec. 14, 1994.

Fred Rich, Legal Aid of W. Mo., Kansas City, MO, for plaintiffs.

Robin Dahlberg, New York City, American Civil Liberties Union.

Robert Presson, Mo. Atty. Gen. Office, Jefferson City, MO, for defendants.

*ORDER*

WHIPPLE, District Judge.

This cause came to be heard on the Joint Motion of the parties, pursuant to Fed.R.Civ. Pro. 60(b)(6), for an order substituting the attached modified Consent Decree, signed by the parties on October 18, 1994, and Operational Guide, signed by the parties on October 18, 1994, for the Court's March 21, 1983, Order (the "Consent Decree"), 564 F.Supp. 1030 (W.D.Mo.1983), and any modifications thereto, and also holding that the Court's December 7, 1992, Order, is superseded by the modified Consent Decree and Operational Guide, except to the extent the December 7th Order substitutes and adds parties as defendants. It appearing that changed circumstances exist, and that the modified Consent Decree and Operational Guide preserve the objectives and further the goals of the prior Consent Decree, namely the protection of children in the legal custody of the Missouri Division of Family Services, Jackson County Office(s), and the provision of child welfare services mandated by federal law, it is

ORDERED, that the modified Consent Decree, signed by the parties on October 18, 1994, and Operational Guide, signed by the parties on October 18, 1994, are substituted for the Court's March 21, 1983, Order and any modifications thereto, and supersede the Court's December 7, 1992, Order, except to the extent that Order substitutes and adds parties.

ATTACHMENT
## MODIFIED CONSENT DECREE
### TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 253 |
| STATEMENT OF PURPOSE | 254 |
| DEFINITIONS | 254 |
| CORE REQUIREMENTS | 256 |
| I. THE CLASS | 256 |
| II. PREVENTING ABUSE, NEGLECT & INAPPROPRIATE DISCIPLINE | 256 |
| A. Licensing and Certification of Foster Homes | 256 |
| B. Renewal of Foster Home Licenses and Certifications | 256 |
| C. Mandatory Training of Foster and Kinship Parents | 256 |
| D. Proper Matching of Children with Appropriate Placements | 257 |
| E. Pre–Placement Process and Supervision of Children | 257 |
| F. Prohibition on the Use of Inappropriate Discipline of Children and Investigation of and Responses to Suspected Incidents of Abuse, Neglect and Inappropriate Discipline | 258 |
| G. Providing Adequate Support | 259 |
| III. HEALTH CARE SERVICES | 259 |
| A. Health Care Services | 259 |
| B. Health Care Plan | 259 |
| C. Health Care History and Health Care Records | 260 |
| D. Medical Case Management | 260 |
| IV. DEVELOPMENT OF PERMANENCY PLANS AND PERMANENCY PLANNING GOALS | 260 |
| A. Permanency Planning Practice Guide | 260 |
| B. Preliminary Service Needs Determination | 260 |
| C. Preliminary Planning Conference | 260 |
| D. Preliminary Permanency Plan | 261 |
| E. Comprehensive Permanency Planning Conference | 261 |
| F. Comprehensive Permanency Plan | 262 |
| G. Written Service Agreements | 262 |
| H. Six–Month Permanency Planning Review | 262 |
| I. Permanency Planning Goals | 263 |
| J. Adoption Training and Information Systems | 263 |
| K. Adoption Planning Conference | 263 |
| L. Adoption Plan | 263 |
| V. PERMANENCY PLANNING IMPLEMENTATION | 264 |
| A. Staff Caseloads, Supervision and Training | 264 |
| B. Unit Structures and Managerial Positions | 265 |
| C. Management Plan | 265 |
| Staff Recruitment and Retention Component | 266 |
| Foster and Adoptive Parent Recruitment and Foster Parent Retention Component | 266 |
| Staff, Foster Parent and Kinship Parent Training Component | 266 |
| Resource Development Component | 266 |
| Manual and Automated Management Information Systems Component | 266 |
| Quality Assurance Component | 267 |
| VI. MISCELLANEOUS PROVISIONS | 267 |
| A. Vendors | 267 |
| B. Remedial Actions | 267 |
| C. Exemptions | 268 |
| D. Monitoring | 268 |
| E. Compliance | 268 |
| F. Reservation of Arguments | 269 |
| G. Exit Plan | 269 |
| EXHIBIT A | 271 |

## INTRODUCTION

At the same time that the parties negotiated the modified Consent Decree, they also negotiated an Operational Guide and a Framework for a Monitoring Methodology.

The Operational Guide is intended to act as an implementation plan for the Consent Decree. The definitional section and the purpose statement of the Consent Decree also apply to the Operational Guide. Any ambiguities in the mandates of the Consent Decree are to be interpreted by reference to the Operational Guide.

The parties intend to ask the Court to incorporate this modified Consent Decree and the attached Operational Guide into a court order which replaces the March 21, 1983, Consent Decree, 564 F.Supp. 1030 (W.D.Mo.1983), and any modifications thereto, and supersedes the Court's Order, dated December 7, 1992, except to the extent the December 7, 1992 Order substitutes and adds parties as defendants. After the Court incorporates the Modified Consent Decree and the Operational Guide, the mandates of the Consent Decree may only be changed with court approval. The parties agree, however, the mandates of the Operational Guide may be changed by mutual consent of the parties without Court authorization or approval. The parties also agree that in exceptional circumstances, class members may be exempted from specific requirements of the Consent Decree or Operational Guide on a case-by-case basis by mutual consent of the parties.

The parties intend to submit the Framework for the Monitoring Methodology to the *G.L. v. Stangler* Foster Care Consent Decree Committee, representatives of the plaintiffs and defendants, and technical experts and is to be used by them to develop a comprehensive monitoring methodology. Once it is completed, the parties will ask the Court to incorporate the monitoring methodology into a court order. After the Court has signed such an order, the monitoring methodology only may be changed with approval from the Court.

## STATEMENT OF PURPOSE

The purpose of this Consent Decree is to provide all class members with the child welfare services required by the constitution and the laws of the United States, including, but not limited to, protection from harm while in the custody of Missouri's Division of Family Services.

## DEFINITIONS

**Adoption Worker:** A social worker as defined herein to whom adoption functions have been assigned. References to the term "adoption worker" throughout this document do not prohibit DFS from assigning adoption functions to a child's primary social worker.

**Alternative Care Placement:** Any out-of-home placement in which a child in DFS legal custody resides.

**Alternative Care Provider:** A child's actual caretaker in his/her Alternative Care Placement.

**Caseload:** Children assigned to a social worker where the social worker functions as the children's case manager.

**Child:** An individual between the ages of zero (0) and twenty-one (21) in the legal custody of DFS.

**Child Abuse/Neglect Central Hotline:** The state-wide, toll-free telephone number operated by the Central Registry Unit of the Missouri Division of Family Services to receive reports concerning suspected child abuse or neglect and initiate the process for investigating those reports.

**Child–Specific Adoption Recruitment:** The process whereby DFS, through its own program and staff, or by contracting with child placement agencies, uses child-specific information and engages in individualized recruitment activity to locate adoptive homes for designated children in the legal custody of DFS.

**Children in DFS Legal Custody:** Children placed in the legal custody of the Missouri Division of Family Services, Jackson County, Missouri Office, pursuant to an order of the Family Court.

**Community Resources:** Agencies, organizations, groups or individuals in and around Jackson County, Missouri that provide or assist in the provision of services to families and children, such as, but not limited to, the Local Investment Commission (LINC), the Missouri Fos-

ter Care and Adoption Association, Partnership for Children, Family Court, Metropolitan Child Abuse Network, Court Appointed Special Advocates (CASA), National Association of Social Workers (Missouri–Kansas unit), and Coalition for Positive Family Relationships.

DFS: Missouri Division of Family Services, a division of DSS and subject to the director of DSS.

DMS: Missouri Division of Medical Services, a division of DSS and subject to the director of DSS.

DSS: Missouri Department of Social Services.

Family: All individuals with whom the child lived prior to entering DFS custody, including parents/caretakers.

Family Court: The Family Court Division of the Circuit Court of Jackson County, Missouri.

Foster Family Home: A private residence of one (1) or more family members licensed by DFS to provide twenty-four (24) hour care to one (1) or more but less than seven (7) children who are unattended by parent or guardian and who are unrelated to either foster parent by blood, marriage or adoption.

Foster Family Group Home: A private home of foster parents, including independent foster family group homes as previously defined by 13 CSR 40–72.010, licensed by DFS to provide twenty-four (24) hour care for seven (7) to twelve (12) children who are unattended by parent or guardian and who are unrelated to either foster parent by blood, marriage, or adoption.

Foster Home: Foster Family Homes, Foster Family Group Homes, and Kinship Homes.

Foster Parent: Any individual who is licensed by DFS to provide twenty-four (24) hour care to one (1) or more children in DFS legal custody.

G.L. Monitoring Committee: The *G.L. v. Stangler* Consent Decree Monitoring Committee, established pursuant to court order dated July 23, 1985, or its successor.

Healthy Children & Youth Program: The Missouri Early Periodic Diagnosis and Treatment (EPSDT) Program. *See* Missouri Medicaid Bulletin, Vol. 14, No. 2 (Jan. 10, 1992) and DSS–DFS Memorandum CS–92–26.

Kinship Home: A private home licensed or certified by DFS to provide twenty-four (24) hour care to a child in DFS legal custody where the alternative care provider is a relative of that child or a nonrelated adult with whom the child has a familial relationship.

Kinship Parent: Any individual who is licensed or certified by DFS to provide twenty-four (24) hour care to one (1) or more children in DFS legal custody, to whom the children are related or with whom the children have a familial relationship.

Licensing Restrictions: Those conditions placed upon a foster home by DFS licensure personnel which limit the number, ages, or gender of children the home can accept. These conditions are independent of the personal preferences of the foster parents.

Panel: The National Expert Panel established to review child welfare services in Jackson County, Missouri.

Panel Recommendations: Those Recommendations made by the Panel as set forth and as amended by the parties in the June 1994 version of the document entitled "Building for the Future: A High Quality System of Care for Child Welfare Services in Jackson County, Missouri," Volume II (Work Plan).

Parents/caretakers: A child's caretakers before he/she enters DFS custody, including, but not limited to, birth parents, relatives and other guardians.

Program Administrator: The Program Administrator for Children's Services of DFS' Jackson County, Missouri Office.

Serious Medical Problems: The medical problems of children who require frequent treatment and continual monitoring or treatment (including, but not limited to, lab work, x-rays, invasive proce-

dures or tests, physical or occupational therapy, or surgeries by a physician or other medical provider) due to a medical condition which affects daily functioning. This term includes physical, emotional or psychological diseases that affect wellness, growth and development.

Service Providers: Individuals, agencies or organizations to whom DFS refers children, families and alternative care providers for the provision of services.

Social Worker: An individual employed by DFS, engaged in the practice of social work, who is licensed or exempt from licensure under state statute.

Supervisor: Any individual employed by DFS to supervise/manage a unit of DFS social workers.

Temporary Foster Care Status: An alternative care placement designated by DFS as temporary until a permanent or more appropriate placement is achieved.

Vendors: Agencies, organizations or individuals with whom DFS, DMS or DSS contracts for the provision of child welfare services, including, but not limited to, foster home licensing services, case management services, training services, foster parent recruitment and retention services, and adoption recruitment services.

## CORE REQUIREMENTS

### I. THE CLASS

1. The requirements of this Consent Decree shall apply to all children in the legal custody of the Missouri Division of Family Services, Jackson County, Missouri Office.

### II. PREVENTING ABUSE, NEGLECT & INAPPROPRIATE DISCIPLINE

A. *Licensing and Certification of Foster Homes*

1. The assessment study of each prospective foster home shall be done by a trained professional and approved by a trained supervisor.

2. All foster parents shall be licensed in accordance with the procedures set forth in Mo.Code State Regs. Title 13, § 40–60.010, *et seq.* They shall meet the minimum qualifications set forth in Mo.Code State Regs. Title 13, § 40–60.030, and their homes shall conform to the physical standards set forth in Mo.Code State Regs. Title 13, § 40–60.040.

3. All kinship parents shall be licensed or certified in compliance with Mo.Code State Regs. Title 13, Division 40, Chapter 60, or guidelines set forth in the DFS Resource Development Handbook or its successor.

4. DFS shall approve or deny an application to become a licensed or certified foster home within ninety (90) days of receipt of that application.

5. DFS shall maintain and utilize an automated management information system accessible to all social workers involved in the licensing process. The system shall contain information about foster parent recruitment and the progress and completion of licensing and relicensing studies. The system shall track compliance with Consent Decree § II.A.4.

B. *Renewal of Foster Home Licenses and Certifications*

1. Prior to or within ninety (90) days of having its license or certification renewed, each foster home must be in full compliance with all training requirements and applicable licensure or certification requirements and regulations, including, but not limited to, Mo. Code State Regs. Title 13, § 40–60.050.

C. *Mandatory Training of Foster and Kinship Parents*

1. Prior to receiving a license or a certificate to be a foster home, all prospective foster parents and kinship parents shall complete at least twelve (12) hours of pre-service training. Kinship parents may be granted provisional foster parent licenses or certificates without completing the foster parent pre-service training, provided they complete it within ninety (90) days after receiving a provisional license or certificate.

2. Prior to the completion of their first two (2)–year licensure or certification period,

all foster parents and kinship parents shall complete fifty-two (52) hours of training, of which at least twelve (12) shall be the pre-service training specified in Consent Decree § II.C.1, and twenty (20) shall be in-service training. During each subsequent two (2)–year licensure or certification period, all foster parents and kinship parents shall complete twenty (20) hours of in-service training.

3. The pre-service and in-service training requirements shall apply to adults residing in foster homes on a permanent basis who have primary child care responsibilities.

4. The pre-service and in-service training shall utilize a core curriculum which, at a minimum, provides foster parents and kinship parents with the knowledge and skills necessary to care appropriately for the class members residing in their homes and informs them of relevant legal mandates and DFS policy. The efficacy of the core curriculum shall be reviewed every two years and the curriculum revised as necessary.

5. DFS shall maintain and utilize an automated management information system accessible to all social workers involved with the foster parent and kinship parent training, licensing and certification processes. The system shall, among other things, track compliance with the mandatory training requirements of Consent Decree §§ II.C.1, II.C.2, and II.C.3.

### D. Proper Matching of Children with Appropriate Placements

1. DFS shall develop and utilize a placement practice guide setting forth policies and procedures to guide social workers' decisions related to placement. DFS shall adhere to the policies and procedures set forth in the placement practice guide.

2. DFS shall maintain sufficient staff and other resources so that all children requiring placement are placed promptly and appropriately, and in accordance with their needs. Placements shall be made taking into account the child's need to be placed as close to home and community as possible, the importance of placing siblings together, and the need to place children in home-like settings, including into kinship homes as appropriate.

3. All social workers involved in the selection of placements for class members shall receive pre-service and annual in-service training on proper placement practices and DFS' policies and procedures relating to placement.

4. DFS shall maintain and utilize an automated management information system accessible to all social workers involved in the placement process. The system shall contain information about available placement resources and shall track placement of all class members.

5. The placement of a child in a foster home shall be in conformity with the licensing or certification restrictions of that home.

6. At no time shall the number of children in a foster family home or kinship home exceed six (6), including the foster parents' or the kinship parents' own children.

7. At no time shall the number of children in a foster family home or kinship home who are five (5) years old or younger exceed four (4). At no time shall the number of children in a foster family home or a kinship home who are two (2) years old or younger exceed two (2).

8. At no time shall the number of children in a foster family group home exceed twelve (12), including the foster parents' own children.

9. Limited exceptions may be made to the capacity restrictions set forth in ¶¶ 5–7 above as set forth in Operational Guide §§ II.D.7 and II.D.8.

10. No class member shall remain in temporary foster care status for longer than thirty (30) days, except as provided in Operational Guide § II.D.11.

### E. Pre–Placement Process and Supervision of the Placement

1. Prior to each new placement, DFS shall prepare the class member and his/her future alternative care provider(s) for that placement by providing to each of them relevant information concerning the other.

2. Absent the circumstances described in Operational Guide §§ II.E.9–12, at least one (1) pre-placement visit shall occur twenty-four (24) hours prior to a class member's placement in a foster home. If possible, a second pre-placement visit, preferably overnight, shall take place.

3. Except as provided in Operational Guide §§ II.E.13 and II.E.14, immediately following and during a class member's placement in a foster home, the child's social worker shall supervise and monitor the child's placement as follows:

a. Within twenty-four (24) hours of each new placement, the worker shall have one (1) face-to-face visit with the child and one (1) contact with the foster parent(s) or kinship parent(s).

b. During the first month of each new placement, the worker shall have a minimum of one (1) face-to-face visit with the child each week and one (1) contact with the foster parent(s) or kinship parent(s) each week. Two (2) of the face-to-face visits with the child must be with the foster parent(s) or kinship parent(s) in the foster home.

c. During the next five (5) months of each placement, the worker must have a minimum of two (2) face-to-face visits with the child each month and two (2) contacts with the foster parent(s) or kinship parent(s) each month. One (1) of the face-to-face visits with the child must be with the foster parent(s) or kinship parent(s) in the foster home.

d. During the remainder of the placement, the worker shall have a minimum of two (2) contacts each month with the child, one (1) of which must be a face-to-face visit with the foster parent(s) or kinship parent(s) in the foster home.

4. Except as provided in Operational Guide §§ II.E.13–15, DFS shall provide class members in residential treatment facilities with the following supervision and monitoring:

a. Within twenty-four (24) hours of each new placement, the child's social worker shall have one (1) face-to-face visit with the child and one (1) contact with the alternative care provider's staff.

b. During the first month of each new placement, the worker shall have a minimum of one (1) face-to-face visit with the child each week and two (2) contacts with the alternative care provider's staff. One (1) contact with the alternative care provider's staff shall be face-to-face.

c. During the next five (5) months of each placement, the worker shall have a minimum of two (2) face-to-face visits with the child each month and two (2) contacts with the alternative care provider's staff each month. One (1) of the contacts with the alternative care provider's staff must be face-to-face.

d. During the remainder of the placement, the worker shall have a minimum of two (2) contacts each month with the child, one (1) of which is face-to-face, and one (1) face-to-face contact each month with the alternative care provider's staff.

F. *Prohibition on the Use of Inappropriate Discipline of Children and Investigation of and Responses to Suspected Incidents of Abuse, Neglect and Inappropriate Discipline.*

1. DFS shall prohibit corporal punishment, inappropriate discipline, abuse, and neglect of class members.

2. Any time a social worker becomes aware that a class member may have been the subject of abuse, neglect or an inappropriate method of discipline, the social worker shall:

a. Notify the Child Abuse/Neglect Central Hotline immediately.

b. Notify his/her supervisor promptly.

c. Notify the placement unit promptly.

d. Determine with his/her supervisor whether any child in the alternative care placement is in imminent danger due to abuse, neglect, inappropriate discipline, or dangerous environmental conditions, and should be removed immediately.

e. Document the incident in writing in the child's record and the record of the alternative care placement in which the child resides.

3. If the incident occurred in a foster home, DFS shall suspend placement of additional children in the home upon receiving notification of the incident until completion of the investigation.

4. Upon receiving notification of the incident, the Child Abuse/Neglect Central Hotline shall refer the case for investigation by a specialized worker who is not supervised by the Program Administrator.

5. The specialized worker shall investigate the incident pursuant to normal Child Abuse/Neglect Procedures.

6. DFS shall establish a permanent team to evaluate the results of each investigation and to make recommendations for services and corrective actions, including the possible removal of children currently in the alternative care placement. Team decisions and recommendations shall be made in writing and forwarded promptly to the Program Administrator or his/her designee for his/her review and instruction regarding further agency action.

7. Team decisions, as modified or adopted by the Program Administrator, shall be implemented. If it is decided that the foster parents or kinship parents who are the subject of the investigation must complete a corrective action plan if they wish to continue as foster parents or kinship parents, DFS shall not place any additional children in their home until they have successfully completed the plan. If the foster parents or kinship parents do not agree to undertake the plan or do not complete it successfully, DFS shall decide whether to revoke their license or certification. The Program Administrator or his/her designee shall have final say on all revocation decisions.

### G. Providing Adequate Supports

1. DFS shall make good faith efforts to obtain an appropriation from the General Assembly for the financing necessary to increase foster care board rates towards an amount consistent with the middle level of the U.S. Department of Agriculture's standard for the cost of raising a child in the urban Midwest and to maintain it at that rate.

2. DFS shall collaborate with foster and kinship parents as individuals and as organized foster and kinship parent groups to establish programs to better assist foster and kinship parents in caring for class members in their homes and to provide incentives for foster and kinship parents to remain as foster and kinship parents.

3. If day care services are necessary, DFS shall provide reimbursement for day care services approved by the social worker of the class member.

4. DFS shall establish and fill position(s) for foster and kinship parent ombudsperson(s) and adoptive parent ombudsperson(s) as specified in Operational Guide § II.G.

### III. HEALTH CARE SERVICES

#### A. Health Care Services

1. All class members shall receive a physical examination within thirty-six (36) hours of coming into DFS custody.

2. All class members shall receive a hearing and eye examination within one (1) month after coming into DFS custody. Class members three (3) years of age or older shall receive a dental examination within one (1) month after coming into DFS custody.

3. All class members shall receive subsequent medical, dental, hearing and eye examinations at the times set forth by the Healthy Children & Youth Program (HCY).

4. All class members shall receive necessary and appropriate health care follow-up services and specialized health care services in a timely manner. DFS shall provide transportation for class members if necessary.

#### B. Health Care Plan

1. DFS shall develop a health care plan for every class member within thirty (30) days of the child's entry into DFS custody.

2. The health care plan shall describe the class member's health care needs, set forth how those needs will be addressed, when

they will be addressed, and who will be responsible for addressing them.

3. Each class member's health care plan shall be revised as needed based on the child's situation.

4. DFS shall take all steps within its control to implement each class member's health care plan.

### C. Health Care History and Health Care Records

1. At the time a class member enters DFS custody, DFS shall collect all available health care information about that child.

2. As long as a class member remains in DFS custody, DFS shall maintain accurate health care records for that child that include the child's health care history and the examinations, treatments or hospitalizations that the child has while in DFS custody.

3. The class member's social worker shall have readily available access to the child's medical history and current health care plan. The social worker shall provide relevant health care information to each and every individual who needs access to that information to provide necessary and appropriate care to the child.

### D. Medical Case Management

1. Each class member shall receive the medical case planning and management services necessary to meet his/her health care needs pursuant to a medical case management system established pursuant to Operational Guide §§ III.D.1 and III.D.2.

### IV. DEVELOPMENT OF PERMANENCY PLANS AND PERMANENCY PLANNING GOALS

### A. Permanency Planning Practice Guide

1. DFS shall develop and utilize a permanency planning practice guide setting forth principles, policies and procedures for the provision of family-focused permanency planning and child-specific adoption services, including the preparation of children for adoption. DFS shall adhere to the principles,

policies and procedures set forth in the permanency planning practice guide.

### B. Preliminary Service Needs Determination

1. DFS shall establish a daily review process which evaluates all children who have entered DFS custody, as a result of a report of child abuse or neglect, within the previous twenty-four (24) hours to determine if placement was, and continues to be, necessary. With the Family Court's permission, children for whom placement is not necessary shall be returned home promptly.

2. Within three (3) working days of a class member's entry into DFS custody as a result of a report of child abuse or neglect, the social worker(s) assigned to the child's case shall make a preliminary determination, based on all information obtainable, of the child's service needs and the service needs of the child's family. For all other class members, DFS shall conduct a preliminary determination of their service needs and the service needs of their families within three (3) working days of receipt of notification of the children's entry into DFS custody.

3. DFS shall establish, with the Family Court, a process by which it receives immediate notification of the Family Court's placement of children in DFS custody.

4. In those situations where a class member needs emergency medical or psychological service intervention prior to the three (3)-day Preliminary Planning Conference discussed below, DFS shall take all steps within its control to provide those services.

### C. Preliminary Planning Conference

1. A Preliminary Planning Conference shall be held for each class member who enters DFS custody as a result of a report of child abuse or neglect, even if that child is only in DFS custody temporarily, no more than three (3) working days after the child's entry into DFS custody, but in all cases prior to the child's detention hearing at the Family Court. The child's social worker shall convene the conference. For all other class members, DFS shall conduct a Preliminary Planning Conference within three (3) work-

ing days after receiving notice of the child's entry into DFS custody.

*D. Preliminary Permanency Plan*

1. During the Preliminary Planning Conference, a Preliminary Permanency Plan shall be developed, tailored to the individual needs and circumstances of the class member and his/her family. At a minimum, this plan shall set forth with specificity the following:

a. The reason for the child's entry into DFS custody.

b. A preliminary assessment of the child's immediate service needs; the steps that shall be taken to meet those immediate needs; the identity of the person(s) (by name or by title) responsible for taking those steps; and the time periods within which the steps shall be taken.

c. The child's preliminary permanency planning goal.

d. A target date for accomplishment of the permanency planning goal.

e. A preliminary assessment of the services needed by the child and the child's family to achieve the permanency planning goal.

f. A schedule of the services that DFS will provide to the child and the child's family to accomplish the permanency planning goal; the time periods within which they will be provided; and the DFS employees (by name or title) responsible for their provision.

g. Diagnostic and evaluative services needed to obtain a comprehensive assessment of the services needed to implement the permanency planning goal, including, but not limited to, the services needed by the child's family; the steps that DFS shall take to obtain the diagnostic and evaluative services; and the time periods within which the steps shall be taken.

h. Unless the child's circumstances dictate otherwise, a weekly parent/child and weekly child/sibling visitation schedule that shall be followed until the Comprehensive Permanency Plan is developed and implemented.

2. DFS shall implement each class member's Preliminary Permanency Plan, taking all steps within its control to provide identified services and facilitate parent/child and child/sibling visitation.

*E. Comprehensive Permanency Planning Conference*

1. Within thirty (30) days from the date of a class member's entry into DFS custody, the child's Permanency Planning Review Team shall convene for the purpose of reviewing and making changes to the child's Preliminary Permanency Plan.

2. A class member's Permanency Planning Review Team shall include:

a. the child's social worker.

b. the child's worker's supervisor.

c. a community representative not employed by DFS.

d. the child's guardian ad litem/attorney.

e. the child unless his/her presence is waived as specified in Operational Guide §§ IV.E.4 and IV.E.5.

f. the child's parents/caretakers unless their parental rights have been terminated.

g. the attorneys for the child's parents/caretakers unless the parental rights of the parents/caretakers have been terminated.

h. the child's potential guardian, if the child's permanency planning goal is guardianship.

i. the child's adoption worker, if the child's permanency planning goal is adoption.

j. the child's adoptive resource if the child's permanency planning goal is adoption and a resource has been identified.

k. the child's alternative care providers.

l. the child's medical case manager (when assigned).

m. representatives from the child's school district if the child is of school age.

n. representatives from the Family Court.

o. the child's and the family's services providers (e.g., counselors, therapists, etc.)

*F. Comprehensive Permanency Plan*

1. Prior to the first meeting of the child's Permanency Planning Review Team, the child's social worker, with input from the child's parents/caretakers, the child's guardian ad litem/attorney and the child's and family's service providers, shall develop a Comprehensive Permanency Plan.

2. The child's Comprehensive Permanency Plan shall, at a minimum, comply with the requirements of the federal Adoption Assistance and Child Welfare Act, 42 U.S.C. §§ 620–629, 671–679, and Mo.Code State Reg. Title 13, § 40–30.010(4).

3. The Comprehensive Permanency Plan also shall set forth the following:

 a. A target date for accomplishment of the child's permanency planning goal.

 b. A comprehensive assessment of the services needed to achieve the permanency planning goal.

 c. A schedule of the services that DFS shall provide to accomplish the permanency planning goal; the time periods within which they will be provided; and the DFS employees (by name or title) responsible for their provision.

 d. Interim goals and measurable objectives needed to be met by the parents/caretakers, the child, the child's potential guardian, and/or the child's adoptive resource, to achieve completion of the permanency planning goal; a target date for accomplishment of each goal and/or objective; and the individuals responsible for achieving completion of the interim goals and measurable objectives.

 e. Schedules for parent/child visitation and weekly child/sibling visitation. If the child's goal is reunification, the schedule shall provide for weekly parent/child visitation unless a therapist recommends, or the Family Court orders, otherwise. If the goal is other than reunification, frequency of visitation shall be determined by the best interest of the child and the child's permanency planning goal.

4. DFS shall implement each child's Comprehensive Permanency Plan, taking all steps within its control to provide identified services and facilitate parent/child and child/sibling visitation.

*G. Written Service Agreements*

1. Written Service Agreement(s) shall be developed contemporaneously with the child's first Comprehensive Permanency Plan. Within thirty (30) days of any change in the child's permanency planning goal, additional Written Service Agreements shall be developed, as necessary, and existing ones reviewed and renegotiated, again as necessary. All Written Service Agreements shall be renegotiated, reviewed or renewed at least every ninety (90) days.

2. Each Written Service Agreement shall, at a minimum, contain the elements set forth in Operational Guide § IV.G.2.

3. DFS shall implement each Written Service Agreement, taking all steps within its control to provide the identified services.

*H. Six–Month Permanency Planning Review*

1. No later than six (6) months after a class member has entered DFS custody and every six (6) months thereafter, the child's Permanency Planning Review Team shall meet to review and make changes to the child's Comprehensive Permanency Plan.

2. Prior to the meeting, the child's social worker, with input from the child's family and, if possible, the child's guardian ad litem/attorney, the child's service providers and the family's service providers, shall revise the child's Comprehensive Permanency Plan so that it contains the following:

 a. A description of what has happened to the child and family since the last meeting of the Permanency Planning Review Team.

 b. What progress, if any, has been made toward achieving the child's permanency planning goal and the interim goals and objectives set forth in the prior Comprehensive Permanency Plan.

 c. A reunification plan for the child and parent/caretaker, if DFS plans to recommend, or has recommended, to the Family Court that reunification of the child and parent/caretaker take place. In addition,

the Comprehensive Permanency Plan shall contain an aftercare plan, including information about the child's health care and specifying the services to be offered to the parent/caretaker and the child after the child returns, shall be developed.

3. DFS shall implement each Comprehensive Permanency Plan resulting from a six (6)–month Permanency Planning Review, taking all steps within its control to provide identified services and facilitate parent/child and child/sibling visitation.

## I. Permanency Planning Goals

1. Throughout the permanency planning process, each class member shall have a permanency planning goal that reflects the current facts and circumstances of that child's case. Appropriate permanency planning goals shall be limited to reunification, adoption, guardianship or independent living.

a. No child under the age of sixteen (16) may be assigned a permanency planning goal of independent living except as set forth in Operational Guide § IV.I.2.

2. If a child's goal is reunification, at the child's Preliminary Permanency Planning Conference and at each meeting of the Permanency Planning Review Team, conference attendees shall consider and document the following:

a. Whether adoption may be an appropriate goal.

b. If it is not an appropriate goal, whether it might become such a goal, and, if so, when and under what circumstances it may become a goal.

c. If it is an appropriate goal, whether a voluntary relinquishment of parental rights may be obtained from the child's parents.

3. If it is decided that adoption might be an appropriate goal and that a voluntary relinquishment cannot be obtained, the case shall be referred to DFS' Legal Section for a determination as to whether grounds for termination of parental rights exist. If DFS' Legal Section determines that sufficient grounds for termination exist, the child's social worker shall forward to the Family Court all documentation necessary to initiate a termination of parental rights proceeding. Such documentation shall be forwarded within thirty (30) days of the decision to refer the case to DFS' Legal Section.

4. Within five (5) days of receiving written notification from the Family Court that a termination of parental rights petition will be filed, the social worker shall change the child's permanency planning goal to adoption and refer the child's case to the Adoption Unit or begin adoption planning immediately.

## J. Adoption Training and Information Systems

1. All social workers involved in the adoption process shall receive pre-service and annual in-service training on adoption issues.

2. DFS shall maintain and utilize an automated management information system, accessible to all social workers involved in the adoption process. The system shall contain information about available adoption resources and efforts undertaken to find adoptive homes for children with permanency planning goals of adoption. The system also shall monitor DFS' compliance with the adoption time lines mandated by Consent Decree §§ IV.I.3, IV.I.4, IV.K.1, IV.L.1 and IV.L.3, and Operational Guide §§ IV.L.1 and IV.L.2.

## K. Adoption Planning Conference

1. Within thirty (30) days of a child's permanency planning goal becoming adoption, an adoption planning conference shall be convened.

## L. Adoption Plan

1. At the Adoption Planning Conference, the child's adoption worker, with input from the attendees, shall develop a plan to prepare the child for adoption and to find him/her an adoptive home as soon as possible. The plan shall set forth with specificity the following:

a. The steps to be taken to prepare the child for adoption, including the provision of counseling services.

b. The steps to be taken to find the child an adoptive home.

c. The steps to be taken once an adoptive resource has been located.

d. The individuals (designated by name or title) responsible for taking the steps set forth above.

e. Time frames within which the above steps shall be taken, which, at a minimum, provide that DFS commences the child-specific recruitment mandated by Operational Guide § IV.L.1.c. within sixty (60) days of a child's Adoption Planning Conference if an appropriate match has not been found before then.

f. Periodic and regular contact between the child's adoption worker, the child, his/her alternative care providers, his/her adoptive resource (if one has been located) and his/her guardian ad litem/attorney to keep them informed of the manner in which the adoption process is proceeding.

g. Once an adoptive resource is identified, the resources and services necessary to make the adoption placement successful.

2. DFS shall implement each child's Adoption Plan.

3. Each class member's Adoption Plan shall be reviewed no later than every ninety (90) days and revised if necessary.

4. Once a termination of parental rights petition has been filed, the fact that a child has not been legally freed for adoption shall not, by itself, be used to justify failure to engage in adoption planning or recruitment or to initiate appropriate contact with an identified adoptive resource, unless the Family Court has instructed otherwise.

## V. *PERMANENCY PLANNING IMPLEMENTATION*

### A. *Staff Caseloads, Supervision and Training*

1. Social workers whose caseloads contain at least one (1) class member shall have caseloads of no more than twenty-five (25) children. Social workers whose caseloads consist solely of class members shall have caseloads of no more than fifteen (15) children.

2. Social workers performing licensing or adoptive home studies shall have caseloads of no more than twenty-five (25) studies at any given time. No more than fifteen (15) of these studies shall be initial studies.

3. Social workers who are doing home studies as well as serving as case managers to class members shall have caseloads of no more than twenty-five (25) studies or children. No more than fifteen (15) of the studies may be initial studies. No more than fourteen (14) of the children may be class members.

4. With respect to units with social workers whose combined caseloads include more than six (6) class members and any units providing placement, licensing, resource development or adoption services, the following shall apply:

a. DFS shall provide each social worker with adequate supervision as defined in the Operational Guide.

b. No supervisor shall supervise more than six (6) workers at any given time. Supervisors may supervise more than six (6) workers for a period not to exceed two (2) weeks if workers are transferring out of the unit and other workers have transferred into the unit.

c. No supervisor shall carry a caseload except on an emergency or temporary basis as defined in Operational Guide § V.A.1 (Panel Recommendation 11).

d. DFS shall make good faith efforts to provide each unit with sufficient clerical support. Towards that end, DFS shall increase its current clerical staff by hiring six (6) additional full-time equivalent clerical personnel between July 1, 1994 and June 30, 1995. These clerical personnel shall be available to social workers whose caseloads contain class members.

e. DFS shall make good faith efforts to provide every two (2) units with a paraprofessional. Towards that end, DFS shall increase its current paraprofessional staff by hiring six (6) new full-time equivalent paraprofessionals by June 30, 1995. These paraprofessionals shall be available to social workers whose caseloads contain class members. In addition, DFS shall take steps to obtain volunteer paraprofessional

assistance from community groups, volunteer organizations, and local universities and schools.

5. No class member shall remain without an assigned social worker for more than five (5) business days.

6. DFS shall provide all new social workers and new supervisors who shall provide services to class members with at least one hundred and five (105) hours of multi-faceted, state-of-the-art orientation training. It shall provide appropriate job-specific orientation training to paraprofessional staff.

7. DFS shall provide at least thirty (30) hours of annual in-service training to all staff providing services to class members, including managers, supervisors and social workers, and eight (8) hours of annual in-service training to clerical staff and paraprofessional staff.

8. By January 1996, DFS shall provide retraining, using a competency based curriculum, to all staff providing services to class members hired before January 1995, including direct service staff, supervisors and managers.

B. *Unit Structures and Managerial Personnel*

1. DFS shall recruit, select and hire a Deputy Program Administrator for Children's Services for the DFS Jackson County, Missouri Office.

2. DFS shall establish a placement mechanism whose staffing and resource needs shall be based on an annual needs assessment.

3. DFS shall obtain or designate one (1) full-time equivalent position to provide educational advocacy services for class members.

4. DFS shall establish a recruitment/retention team consisting of a minimum of six (6) full-time persons who report to one (1) supervisor. The team shall have responsibility for the Foster and Adoptive Parent Recruitment and Foster Parent Retention component of the Management Plan.

5. DFS shall designate a Resource Development Coordinator, who, together with the management staff of DFS' Jackson County, Missouri Office, shall have responsibility for developing and implementing the Resource Development component of the Management Plan. The Resource Development Coordinator shall be assisted in implementation of the Resource Development component by the management staff and one (1) full-time person, who is not also a part of the recruitment/retention team.

6. DFS shall establish a Quality Assurance Unit, staffed with individuals specifically trained to develop and implement the Quality Assurance component of the Management Plan.

7. DFS shall establish a Training Unit which shall be staffed with, at minimum, a Coordinator of Training and Staff Development and two (2) training specialists. The Training Unit shall be responsible for developing and implementing the staff, foster parent and kinship parent training component of the Management Plan.

8. DFS shall contract for or hire one (1) full-time staff person with responsibility for the programming and maintaining of its Jackson County, Missouri automated management information systems.

C. *Management Plan*

1. DFS shall develop a Management Plan to assist it in providing child welfare services. Because it is anticipated that the Management Plan shall address the provision of child welfare services to all eligible families and children, including those families who do not have children in DFS legal custody and those children who are not class members, the parties recognize that the plan may address issues and topics outside the scope of the Consent Decree. The inclusion of such issues and topics in the Management Plan shall not be deemed to broaden DFS' responsibilities under this Consent Decree and the accompanying Operational Guide. Such issues and topics shall not be monitored and shall not be available for use against the defendants.

2. The Management Plan shall contain, at a minimum, the following components, each

of which is defined in further detail in subsequent sections of this Consent Decree:

 a. Staff Recruitment and Retention.

 b. Foster and Adoptive Parent Recruitment and Foster Parent Retention.

 c. Staff, Foster Parent and Kinship Parent Training.

 d. Resource Development.

 e. Quality Assurance.

 f. Manual and Automated Management Information Systems.

3. Each component of the Management Plan shall, at a minimum, provide for the following:

 a. An annual needs assessment conducted pursuant to reasonable professional standards.

 b. The establishment of goals based upon the needs assessment.

 c. Identified activities and specific tasks designed to accomplish the goals, including strategies to obtain or develop the resources needed to accomplish the goals.

 d. Timetables for accomplishing the goals set forth in subsection (b) and the activities and tasks set forth in subsection (c).

 e. The designation, by title or name, of the individuals responsible for completion of the activities or tasks, including designation of the management staff person who shall have primary responsibility for implementation of each component of the Management Plan.

4. The Management Plan and each of its components shall be revised annually.

5. DFS shall implement the Management Plan and each of its components by conducting the needs assessments mandated by Consent Decree § V.C.3.a, establishing the goals mandated by Consent Decree § V.C.3.b., and undertaking the activities and accomplishing the specific tasks mandated by Consent Decree § V.C.3.c. within the time periods mandated by Consent Decree § V.C.3.d.

*Staff Recruitment and Retention Component*

6. The Staff Recruitment and Retention component of the Management Plan shall be developed, with input from community resources, to recruit qualified candidates for supervisor, social worker and support staff (including administrative, clerical and paraprofessional) positions, and to retain qualified supervisors, social workers and support staff (including administrative, clerical and paraprofessional personnel).

*Foster and Adoptive Parent Recruitment and Foster Parent Retention Component.*

7. The Foster and Adoptive Parent Recruitment and Foster Parent Retention component of the Management Plan shall provide for the development, with input from community resources, of a multi-year plan to recruit a sufficient number and variety of foster and adoptive parents and to retain a sufficient number and variety of foster parents in an effort to facilitate the timely and appropriate placement of each class member.

*Staff, Foster Parent and Kinship Parent Training Component*

8. The Staff, Foster Parent and Kinship Parent Training component of the Management Plan shall be a Comprehensive Annual Training Plan which provides for all staff, foster parent and kinship parent pre-service, orientation and in-service training required by the Consent Decree and the Operational Guide.

*Resource Development Component*

9. The Resource Development component of the Management Plan shall be a Jackson County Resource Development Plan, developed with input from community resources, that sets forth the resource needs of the Jackson County, Missouri Office of DFS and strategies for meeting those needs.

*Manual and Automated Management Information Systems Component*

10. The Manual and Automated Management Information Systems component of the Management Plan shall provide for a comprehensive review of all management information systems and record keeping systems utilized in DFS' Jackson County, Missouri

Office and a revision of those systems, if necessary, to reduce duplication and the paperwork burden on social workers and supervisors, and to permit timely and complete record-keeping, and the accessibility of information. In addition, it shall provide for the automation of management information systems, including, but not limited to, the information systems utilized by supervisors and social workers involved in the licensing, foster parent training, placement and adoption processes to aid in pro-active case management.

*Quality Assurance Component*

11. The Quality Assurance component of the Management Plan shall provide for the development of a comprehensive quality assurance program. At a minimum, the program shall provide for periodic systemic and specialized reviews, timely reporting mechanisms, remedial actions and such training as may be necessary.

12. DFS, in conjunction with DMS, shall establish on-going quality assurance procedures to assure implementation of health care plans and the provision to class members of medical case management and planning in accordance with reasonable professional standards.

## VI. *MISCELLANEOUS PROVISIONS*

### A. *Vendors*

1. Nothing in this Consent Decree shall preclude DFS from contracting with qualified vendors to license, relicense or certify foster homes; to provide foster parent recruitment, retention and training services; to provide adoption services; and to provide case management services.

 a. The vendors with whom DFS contracts for the provision of licensing services; foster parent recruitment, retention and training services; adoption services; and case management services shall be bound by the requirements of the Consent Decree, including the training requirements.

 b. Should DFS contract with any vendor for the provision of case management services, it shall develop a plan setting forth how it intends to monitor and supervise these vendors and submit it to the plaintiffs and the *G.L.* Monitoring Committee for review and comment. The plan shall be implemented within a reasonable period.

### B. *Remedial Actions*

1. DFS shall develop and implement a plan to identify class members who have had a goal of reunification for more than eighteen (18) months, and all class members who have a goal of reunification but have not had parental contact for at least six (6) months. In addition, the plan shall provide for the following:

 a. An accelerated reevaluation of the permanency planning goals for each of these children, a determination of whether that goal remains appropriate, and if necessary, a change in goal.

 b. Intensive casework designed to achieve successful implementation of each child's permanency planning goal within a reasonable period of time.

2. DFS shall develop and implement a plan designed to provide special, intensive recruitment and adoptive placement efforts for those class members who have had a goal of adoption for more than nine (9) months but who have no identified and available adoptive resource.

3. DFS shall develop and implement a plan designed to close foster homes where DFS has determined that the foster parents should no longer serve as foster parents or the foster parents have indicated that they no longer wish to care for children in DFS legal custody.

4. DFS shall develop and implement a plan designed to take appropriate corrective action with respect to reports of abuse, neglect or inappropriate discipline that concern class members that have been received since January 1, 1993, and that have been substantiated or determined to be "probable cause" (substantiated) or "unsubstantiated with preventive services indicated."

### C. Exemptions

1. In exceptional circumstances, class members may be exempted from specific requirements of the Consent Decree or Operational Guide on a case-by-case basis by mutual consent of the parties. Requests for such exemptions shall be made in writing by the Program Administrator or his/her designee to plaintiffs' counsel. Plaintiffs' counsel shall respond in writing and if the exemption is agreed upon, correspondence pertaining thereto shall be placed in the class member's case file.

### D. Monitoring

1. The *G.L. v. Stangler* Foster Care Consent Decree Monitoring Committee, established pursuant to Court Order dated July 23, 1985, shall continue to exist until the Consent Decree expires pursuant to the terms of the Exit Plan described below. It shall monitor defendants' compliance with the Consent Decree and the Operational Guide pursuant to a methodology agreed to by the parties and submitted to the Court for its incorporation into a court order, and shall report the results of its monitoring activities in semi-annual reports to the Court and the parties. The Committee may prepare additional reports as the parties request or the Court directs.

2. Any party may challenge the accuracy of a report issued by the *G.L.* Monitoring Committee by filing a motion with the Court within sixty (60) days of the Committee's issuance of that report.

3. Defendants shall permit the *G.L.* Monitoring Committee to have access to all information, personnel and documents necessary to complete the specific tasks identified in the Monitoring Methodology. This access may include, but is not limited to, access to class members and their families; alternative care providers; service providers; vendors; case records concerning class members, their families and their placements; and DFS staff, both at the state and local level. Any requests for access to personnel and information not contemplated by the Monitoring Methodology shall be made to a designated DFS employee. Such personnel and information shall be made available at reasonable times and places and in a manner that does not unreasonably interfere with the operation of DFS.

4. Defendants shall provide the *G.L.* Monitoring Committee with the office space, office equipment, compensation and funding reasonably necessary for it to perform its job, subject to Court approval.

5. By December 31, 1994, the parties shall submit to the Court for its approval a comprehensive methodology, developed with assistance from the *G.L.* Monitoring Committee and appropriate technical experts and based on the Framework for Monitoring Methodology referred to in the Introduction to this Consent Decree. That methodology may include an analysis of information collected: (a) by DFS' management and information systems; (b) from a review of relevant case records; and (c) from interviews with class members and their families, DFS staff, alternative care providers, and service providers.

6. The monitoring methodology can be changed only with approval from the Court.

### E. Compliance

1. Notwithstanding Consent Decree § VI.G, the parties agree that defendants shall work to achieve 100% compliance with each and every provision of the Consent Decree and Operational Guide.

2. Plaintiffs agree not to move to hold defendants in contempt for:

a. Failure to reach 100% compliance with respect to a particular provision of the Consent Decree or Operational Guide, provided defendants have reached the compliance level for that provision set forth in the Exit Plan.

b. Failure to comply with all of Panel Recommendation 3, Task 1.c of Panel Recommendation 10, or Tasks 1 and 2 of Panel Recommendation 11.

c. Any reasons prohibited by Consent Decree § V.C.1 and Framework for Monitoring Methodology § VII (Additional Measures).

d. Failure of individuals identified in Consent Decree §§ IV.E.2.c-o to attend any Comprehensive Permanency Planning Conferences.

## F. Reservation of Arguments

1. Subject to Consent Decree §§ V.C.1 and VI.E.2, plaintiffs reserve any and all legal or factual arguments, theories or claims that may be advanced: (a) to enforce the Consent Decree or the Operational Guide, including, but not limited to, any arguments, claims or theories that may be made in support of a motion for an order holding defendants in contempt; or (b) to bar expiration of the Consent Decree and the Operational Guide or the transfer of any provision of either document on the grounds specified in Consent Decree § VI.G.2.d.

2. Defendants reserve any and all legal or factual arguments, claims or defenses, including, but not limited to, any defenses based on the eleventh amendment to the United States Constitution, that may be made to defend against a motion: (a) to enforce the Consent Decree or Operational Guide, including, but not limited to, a motion for an order holding defendants in contempt; or (b) to bar expiration of the Consent Decree and the Operational Guide or the transfer of any provision of either document on the grounds specified in Consent Decree § VI.G.2.d.

3. Notwithstanding Consent Decree § VI.E.2, but subject to Consent Decree § V.C.1, the parties are not precluded from using any data or factual information gathered by the G.L. Monitoring Committee, for whatever reason, to support or to defend against a motion: (a) to enforce the Consent Decree and Operational Guide, including a motion to hold defendants in contempt for failing to comply with sections of the Consent Decree and Operational Guide not listed in Consent Decree § VI.E.2; or (b) to bar the expiration of the Consent Decree and the Operational Guide or the transfer of any provision of either document on the grounds specified in Consent Decree § VI.G.2.d.

4. Nothing contained in the Consent Decree, Operational Guide or Monitoring Methodology shall be deemed to require a level of compliance than would otherwise exist under law. The standards contained in the Exit Plan are only for purposes of exit from the Consent Decree and its related provisions and shall not be deemed to constitute an agreement by the parties on what constitutes substantial compliance for any other purpose.

5. All claims by plaintiffs for costs and attorneys' fees are reserved, unless otherwise resolved prior to the Court's approval of the Consent Decree.

## G. Exit Plan

1. To exit from the Consent Decree, the Operational Guide and the Monitoring Methodology, defendants are required to reach the compliance levels contained in the Exit Plan, attached hereto as Exhibit A and incorporated by reference, and to sustain that compliance for one (1) one and one-half (1½) year period as reflected in three (3) consecutive six (6)–month reports of the G.L. Monitoring Committee. Should defendants' level of compliance with any given standard be no more than five (5) percent below that set forth in the Exit Plan for any one (1) of the six (6)–month periods defendants shall not be precluded from exiting the Consent Decree.

2. Exiting from the Consent Decree, Operational Guide and Monitoring Methodology shall occur as follows:

a. The Exit Plan, as set forth in Exhibit A, is divided into ten (10) sections.

b. The G.L. Monitoring Committee shall transfer monitoring of each section to DFS' internal Quality Assurance Unit immediately after defendants reach the designated compliance level with respect to each identified standard of that section and sustain compliance at that level for the designated period of time. While defendants shall make good faith efforts to maintain the designated compliance levels, a drop in compliance levels after the transfer of a section shall not be, by itself, grounds for a motion to enforce the Consent Decree or Operational Guide, to hold defendants in contempt or to bar future expiration of the Consent Decree as set

forth in the Exit Plan. Notwithstanding the above, plaintiffs may seek to enforce transferred sections or standards if a drop in compliance levels results in a violation of the plaintiff children's constitutional or federal statutory rights. Nor are plaintiffs precluded from seeking to enforce transferred sections or standards as remedial measures in connection with motions to enforce sections or provisions that have not been transferred.

c. The Consent Decree, Operational Guide and Monitoring Methodology shall expire, without any further order of the court and will be of no further force and effect, sixty (60) days after the transfer of the last section(s) to DFS' internal Quality Assurance Unit.

d. The reports of the *G.L.* Monitoring Committee shall identify the sections, if any, that are to be transferred to DFS' internal Quality Assurance Unit for the subsequent monitoring period. Plaintiffs reserve the right to move, after receiving the reports with such notification, to bar the transfer of monitoring to the Quality Assurance Unit or to bar the expiration of the Consent Decree, Operational Guide and Monitoring Methodology on the grounds that defendants are continuing to violate the constitutional or federal statutory rights of the plaintiff children or that defendants have not complied with the prerequisites for transfer or expiration.

e. The Exit Plan has not included any target dates for meeting the compliance standard. To the extent that any provisions of the Consent Decree, Operational Guide or Panel Recommendation referenced in the Exit Plan refers to target dates, such dates are not intended to be part of the Exit Plan.

3. The Court shall retain jurisdiction over this lawsuit until the Consent Decree, Operational Guide and Monitoring Methodology expire in their entirety pursuant to the terms of the Exit Plan.

Dated: October 18, 1994.

/s/ Gary Stangler
Gary Stangler
Director
Department of Social Services
State of Missouri

/s/ Carmen K. Schulze
Carmen K. Schulze
Director
Division of Family Services
Department of Social Services
State of Missouri

/s/ Mary Browning
Mary Browning
Deputy Director
Division of Legal Services
Department of Social Services
221 West High Street
Jefferson City, Missouri 65101
Missouri Bar No. 34633

/s/ Richard L. Matt
Richard L. Matt
Deputy Director
Children's Services
Division of Family Services
Department of Social Services
State of Missouri

/s/ Kathleen Dowd
Kathleen Dowd
Program Administrator
Children's Services
Division of Family Services,
Jackson County Office
Department of Social Services
State of Missouri

/s/ Robert Presson
Robert Presson
Assistant Attorney General
221 West High Street
Jefferson City, Missouri 65101
Missouri Bar No. 23256

/s/ Robin L. Dahlberg
Robin L. Dahlberg
Senior Staff Counsel
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York 10036

/s/ Fred Rich
Fred Rich
Legal Aid of Western Missouri
1005 Grand Street
Kansas City, Missouri 64106
Missouri Bar No. 28152

SO ORDERED:

/s/ Dean Whipple
Dean Whipple, Judge
United States District Court

## EXHIBIT A

### (EXIT PLAN)

#### I. Licensing and Certification:

1. 95% of licensing and certification studies mandated by Consent Decree § II.A shall be done by trained professionals.

2. 95% of foster homes shall be licensed, relicensed or certified in accordance with Consent Decree §§ II.A.2, II.A.3 and II.B.1.

3. 80% of applications to become a foster parent or kinship parent shall be acted upon within ninety (90) days of the receipt of a completed, official application form by the DFS licensing unit.

4. DFS shall implement the foster parent training curriculum required by Consent Decree § II.C.4 and Operational Guide §§ II.C.1 and II.C.2.

5. 95% of foster parents, kinship parents and adults with primary child care responsibilities as defined in Consent Decree § II.C.3 and Operational Guide § II.C.4 shall complete pre-service training within the time period set forth in Consent Decree § II.C.1.

6. 95% of foster parents, kinship parents and adults with primary child care responsibilities as defined in Consent Decree § II.C.3 and Operational Guide § II.C.4 shall complete the in-service training required by Consent Decree § II.C.2 within ninety (90) days of relicensure or certification as per Consent Decree § II.B.1.

#### II. Placement:

1. DFS shall develop, disseminate and train workers on the placement practice guide mandated by Consent Decree § II.D.1 and Operational Guide §§ II.D.1 (Panel Recommendation 56) and II.D.2.

2. DFS shall establish a placement mechanism, as required by Consent Decree § V.B.2 and Operational Guide § V.B.1 (Panel Recommendation 54), that has the staffing and resources identified by the most recent needs assessment.

3. 95% of social workers engaged in the selection of alternative care placements shall receive the training required by Consent Decree § II.D.3 and Operational Guide § II.D.3.

4. Throughout each six (6) month monitoring period, 85% of a randomly selected, statistically valid sample of class members shall be in placements that conform to Consent Decree §§ II.D.5–10 and Operational Guide §§ II.D.5–8 and II.D.11. A placement that is not in conformity for more than one reason shall constitute only one instance of non-compliance. Multiple inappropriate placements of a single class member during a six (6) month monitoring period shall constitute only one instance of non-compliance.

5. 95% of class members and alternative care providers shall be provided with 80% of available relevant information as defined by Operational Guide §§ II.E.1 and II.E.3 prior to each new placement or at the time of placement as permitted by Operational Guide II.E.4.

6. 85% of pre-placement visits required by Consent Decree § II.E.2 and Operational Guide §§ II.E.5 and II.E.9–12 shall occur.

7. DFS shall review the placements of 90% of class members coming into its custody as a result of a report of abuse or neglect within twenty-four (24) hours of their entry into DFS custody. Reviews conducted as specified in Operational Guide § IV.B.2 shall be deemed in compliance.

8. In 90% of the cases in which DFS determines after the twenty-four (24)–hour review that out-of-home placement is not necessary, DFS shall recommend to the Family Court, within twenty-four (24) hours of its determination, that the child should be returned home.

## III. Supervision of Class:

1. 90% of class members and their alternative care providers shall receive 90% of the visits and contacts required by Consent Decree §§ II.E.3 and II.E.4 and Operational Guide § II.E.13–15.

2. 95% of all incidents of suspected abuse, neglect or inappropriate discipline shall be reported as required by Consent Decree §§ II.F.2.a–c.

3. 95% of all incidents of suspected abuse, neglect or inappropriate discipline shall be documented as required by Consent Decree §§ II.F.2.e and Operational Guide § II.F.3.

4. 95% of all incidents of suspected abuse, neglect or inappropriate discipline shall be investigated and acted upon as required by Consent Decree §§ II.F.4–7 and Operational Guide §§ II.F.1, II.F.2, and II.F.4–6.

5. 95% of the foster homes that are the subject of pending investigations of suspected incidents of abuse, neglect or inappropriate discipline, shall not receive additional placements of children as per Consent Decree § II.F.3.

## IV. Medical:

1. 95% of all class members shall receive medical, hearing, eye and dental examinations as specified in Consent Decree §§ III.A.1–3 and Operational Guide § III.A.1.

2. 95% of class members shall receive necessary and appropriate health care follow-up services and specialized health care services in a timely manner as required by Consent Decree § III.A.4 and Operational Guide § III.A.2.

3. 95% of class members shall have health care plans within thirty (30) days of their entry into DFS custody.

4. 90% of class members shall have health care plans that include the elements set forth in Operational Guide § III.B.1.

5. Health care plans of 90% of class members shall be reviewed and revised with the frequency required by Consent Decree § III.B.3 and Operational Guide § III.B.2.

6. For 90% of the class members, DFS shall disseminate health care information in its possession pertaining to those children as required by Consent Decree § III.C.3 and Operational Guide § III.C.2.

7. DFS shall have implemented a medical case management system mandated by Consent Decree § III.D.1 and Operational Guide §§ III.D.1 and III.D.2.

## V. Planning:

1. DFS shall develop, disseminate and train staff on the permanency planning practice guide required by Consent Decree § IV.A.1 and Operational Guide §§ IV.A.1 (Panel Recommendations 53, 64 and 67 (task 4)) and IV.A.2.

2. 90% of the class members shall receive a preliminary needs assessment within the time periods specified in Consent Decree § IV.B.2.

3. 90% of class members shall have a preliminary planning conference within the time periods specified in Consent Decree § IV.C.1.

4. 90% of class members shall have preliminary permanency plans that contain the elements set forth below:

 a. Preliminary assessment of child's immediate service needs.

 b. Preliminary permanency planning goal.

 c. Preliminary assessment of services needed to achieve permanency planning goal.

 d. Schedule of services.

 e. Visitation schedule.

5. 95% of class members shall have a comprehensive permanency planning conference within the time periods specified in Consent Decree § IV.E.1 or Operational Guide § IV.E.3.

6. 90% of class members shall receive a comprehensive assessment of their service needs and the service needs of their families within thirty (30) days of their entry into DFS custody.

7. 95% of class members shall receive a comprehensive permanency plan within the

time period specified in Consent Decree § IV.F.1 and Operational Guide § IV.F.2.

8. 90% of class members shall have comprehensive permanency plans that contain the elements set forth in Consent Decree § IV.F.3.

9. 90% of class members shall have a permanency planning goal that complies with Consent Decree § IV.I.1 and Operational Guide § IV.I.2.

10. DFS shall solicit and document the input of the families of 90% of class members with a goal of reunification in the development of the children's comprehensive permanency plan.

11. The comprehensive permanency plans of 90% of class members shall be reviewed with the frequency required by Consent Decree § IV.H.1.

12. Prior to the review contemplated by Consent Decree § IV.H.1, the comprehensive permanency plans of 90% of the class members shall be revised to address the items set forth in Consent Decree § IV.H.2.

13. 95% of class members shall have written service agreements developed and signed as set forth in Consent Decree §§ IV.G.1 and IV.G.2 and Operational Guide §§ IV.G.1 and IV.G.2.

## VI. Service Provision:

1. 90% of class members with emergency medical or psychological needs shall begin to receive services within the time period specified in Consent Decree § IV.B.4.

2. 90% of class members shall receive the services identified in their preliminary plan within the time frame set forth in the plan. Services provided within a 10% variance of the time originally specified in the plan shall be deemed in compliance.

3. 90% of the class members shall receive the services identified in their comprehensive permanency plans within the time frame specified therein. Services provided within a 10% variance of the time originally scheduled shall be deemed to be in compliance.

4. 90% of class members shall receive 85% of child/parent visits required by a preliminary or comprehensive permanency plan shall have occurred. Child/parent visits that do not occur because of the specific circumstances of the child or the parent (and such specific circumstances are documented in the child's case record) shall not be included within the sample analyzed to determine compliance levels.

5. 90% of class members shall receive 85% of child/sibling visits required by a preliminary or comprehensive permanency plan shall have occurred. Child/sibling visits that do not occur because of the specific circumstances of the child or the sibling(s) (and such specific circumstances are documented in the child's case record) shall not be included within the sample analyzed to determine compliance levels.

## VII. Adoption:

1. 95% of social workers involved in the adoption process shall receive the training required by Consent Decree § IV.J.1 and Operational Guide §§ IV.J.1 and IV.J.2.

2. In 90% of the instances in which a permanency planning review team decides to refer a child's case to DFS' Legal Section for determination as to whether sufficient grounds for termination of parental rights exist, the steps mandated by Consent Decree §§ IV.I.3 and IV.I.4 shall be taken within the time periods mandated by Consent Decree §§ IV.I.3 and IV.I.4.

3. 90% of class members with a permanency planning goal of adoption shall have an adoption planning conference within thirty (30) days of the assignment of a goal of adoption.

4. 95% of a class members with a permanency planning goal of adoption shall have adoption plans that contain the elements set forth below:

a. Steps to be taken to prepare the child for adoption.

b. Steps to be taken to find the child an adoptive home.

c. Time frames within which steps shall be taken.

d. Steps to be taken once an adoptive resource has been located.

e. Schedule of contacts.

5. 90% of the class members with a permanency planning goal of adoption shall receive 90% of the adoptive recruitment activities set forth in their adoption plans within the time periods set forth in those plans, Consent Decree § IV.L.1.e and Operational Guide § IV.L.1. Recruitment activities occurring within a 10% variance of the time specified in the adoption plans, Consent Decree § IV.L.1.e or the Operational Guide shall be deemed in compliance.

6. 90% of class members with a permanency planning goal of adoption shall receive 90% of all visits and contacts required by Operational Guide IV.L.3 and IV.L.4 and their adoption plans.

7. 95% of adoption plans shall be reviewed at least every ninety (90) days.

## VIII. Staff Caseloads and Training:

1. DFS shall be operating a training unit as required by Consent Decree § V.B.7 and Operational Guide § V.B.1 (Panel Recommendation 13), and shall have reviewed its staffing and resource needs annually.

2. 95% of DFS staff shall receive the orientation and in-service training required by Consent Decree §§ V.A.6–7 within the time frames set forth therein.

3. DFS shall retrain staff as required by Consent Decree § V.A.8.

4. 95% of social workers shall have caseloads in conformity with Consent Decree §§ V.A.1–3.

5. 90% of supervisors supervising units whose workers have combined caseloads of six (6) or more class members or that provide licensing, placement, resource development or adoption services shall be supervising no more than six (6) social workers. Exceptions may be made as set forth in Consent Decree § V.A.4.b.

## IX. Information Systems:

1. Social workers engaged in foster and kinship parent training, licensing and certification processes shall have access to an automated management information system that operates in the manner contemplated by Consent Decree § II.C.5.

2. Social workers engaged in licensing or certification of foster homes shall have access to an automated management information system that operates in the manner contemplated by Consent Decree § II.A.5.

3. Social workers engaged in the placement process shall have access to an automated management information system that operates in the manner contemplated by Consent Decree § II.D.4.

4. Social workers engaged in the adoption process shall have access to an automated management information system that operates in the manner contemplated by Consent Decree § IV.J.2.

5. DFS shall hire or contract with a full-time person to program and maintain the automated management information system.

## X. Management:

1. DFS shall have hired a Deputy Program Administrator for Children's Services for the Jackson County Office.

2. DFS shall have hired six (6) additional full-time equivalent clerical workers between July 1, 1994, and June 30, 1995.

3. DFS shall have hired six (6) additional full-time equivalent paraprofessionals between July 1, 1994, and June 30, 1995.

4. DFS shall have designated a full-time equivalent position with appropriate knowledge of the local educational system to act as the educational advocate required by Consent Decree § V.B.3.

5. DFS shall have designated a Resource Development Coordinator and assigned the staffing required by Consent Decree § V.B.5.

6. DFS shall be operating a foster and adoptive parent recruitment and retention program, staffed with six (6) full-time social workers who report to one (1) supervisor.

7. DFS shall have established a Quality Assurance Unit capable of assuming the tasks and responsibilities of the *G.L.* Monitoring Committee and conducting its own quality assurance program.

8. DFS shall establish, with the Family Court, the process mandated by Consent Decree § IV.B.3.

9. DFS shall develop and implement annual plans to recruit and retain social work staff.

10. DFS shall develop and implement annual plans to recruit and retain foster and adoptive parents, including temporary and specialized/professional foster parents.

11. DFS shall develop and implement annual plans to increase the number of providers that provide services to class members and their families.

12. DFS shall operate a program that provides support and incentives to foster, kinship, and prospective adoptive parents as required by Consent Decree § II.G and Operational Guide § II.G.

13. DFS shall be operating the ombudsperson program as required by Consent Decree § II.G.4. and Operational Guide §§ II.G.1 (Panel Recommendation 22 (task 4.d), II.G.2.b and II.G.3.

14. DFS shall take the remedial measures required by the Consent Decree §§ VI.B.1–4 and Operational Guide §§ VI.B.1–2.

## MODIFIED CONSENT DECREE OPERATIONAL GUIDE

### I. *INTRODUCTION*

When this Operational Guide directs DFS to implement a Panel Recommendation, it directs DFS to implement the tasks and products of that Recommendation as those tasks and products have been or may be amended by mutual consent of plaintiffs and defendants. The parties recognize that some of the tasks and products permit administrative flexibility and the exercise of professional judgment.

Copies of the relevant Panel Recommendations, including their tasks and products, are attached hereto in numerical order and incorporated by reference. Certain of the attached Panel Recommendations have been modified by mutual consent of the parties.

The fact that a Panel Recommendation may be referred to in a section of the Operational Guide or with reference to a particular section of the Consent Decree does not mean that the Recommendation is irrelevant to other sections.

Where there is a conflict between the language of a Panel Recommendation and the text of the Operational Guide, the Operational Guide controls.

### II. *PREVENTING ABUSE, NEGLECT & INAPPROPRIATE DISCIPLINE*

#### A. *Licensing and Certification of Foster Homes*

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendation 21, including its tasks and products.

2. For purposes of Consent Decree § II.A.1, a professional or supervisor shall be considered trained if he/she receives preservice and annual in-service training on the licensing process, the practice issues attendant to conducting a home study, the decisions involved in assessing the suitability of a foster home and the adequacy of foster parenting skills, and the specific psychological, emotional, physical and educational problems that children in DFS legal custody are likely to have.

3. The curriculum used for the orientation and annual in-service training mandated by Consent Decree § II.A.1, or any revisions thereto, shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and comment.

4. All references to state regulations in this section shall be to regulations in effect in January 1994 or as subsequently amended. Proposed amendments to these regulations shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and com-

ment prior to publication in the Missouri Register.

### B. Renewal of Foster Home Licenses and Certifications

1. All references to state regulations in this section shall be to regulations in effect in January 1994 or as subsequently amended. Proposed amendments to these regulations shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and comment prior to publication in the Missouri Register.

### C. Mandatory Training of Foster and Kinship Parents

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendation 24, including its tasks and products.

2. The core curriculum referred to in the Consent Decree shall include those topics outlined in Panel Recommendation 24.

3. Should DFS wish to permit foster and kinship parents to obtain training credits for training that does not occur in the traditional classroom setting, it shall provide plaintiffs and the *G.L.* Monitoring Committee with a list of out-of-classroom training options available to foster and kinship parents, the training credits afforded by each, and mechanisms for evaluating the effectiveness of such training on a foster-parent-by-foster-parent basis.

4. For purposes of Consent Decree § II.C.3, adults with primary child care responsibilities shall be defined as adults, identified by the foster or kinship parents at the time of licensure, relicensure or certification, as providing a minimum of forty (40) hours of child care per week throughout the upcoming licensure period. These adults must complete the same hours of training required of the foster or kinship parents during that licensure period.

5. DFS shall review annually with each foster and kinship parent his or her compliance with the Consent Decree's mandatory foster and kinship parent training requirements and, where appropriate, develop a plan to ensure that the foster or kinship parent

receives the required number of hours prior to the expiration of the licensing period.

### D. Proper Matching of Children with Appropriate Placements

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 54 and 56, including their tasks and products.

2. The placement practice guide mandated by Consent Decree § II.D.1 shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and comment prior to its adoption and publication.

3. The training mandated by Consent Decree § II.D.3 shall consist of at least six (6) hours of pre-service and six (6) hours of annual in-service training. The six (6) hour pre-service and the six (6) hour annual in-service training may count towards the social worker's annual thirty (30) hour in-service training.

4. The curriculum used for the training mandated by Consent Decree § II.D.3 and any revisions thereto, shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and comment.

5. During the first year of a foster parents' first two (2)–year licensure period, DFS shall not make any placements in the foster home that would cause a change in the foster home's licensing restrictions. During subsequent licensure periods, placement in a foster home that would cause a change in the home's licensing restrictions only may be made with prior written approval of the licensing supervisor.

6. During the first six (6) months of the first foster parent licensure period, DFS shall not permit more than one (1) foster child to reside with foster parents who have had no previous foster care experience. Exceptions can be made for sibling groups of two (2). Placement of children over the age of eighteen (18) and under the continuing jurisdiction of the Family Court shall be exempt from this requirement with the foster parents' consent.

7. With respect to foster family homes, DFS may exceed the capacity restrictions set forth in Consent Decree §§ II.D.5–7 only if

necessary to place the siblings of a child already residing in the foster family home. If DFS wishes to make exceptions to the capacity restrictions of Consent Decree §§ II.D.5–7, the licensing unit must conduct an assessment of the foster family home's ability to adequately accommodate the placements before the exception is made and document that assessment in the foster parents' record. If the licensing unit determines that the foster family home can accommodate the sibling placements only if appropriate supports and services are provided, DFS shall provide such supports and services. Under no circumstances shall the number of children in the foster family home exceed two (2) above the foster family home's license capacity. Under no circumstances shall there be more than five (5) children who are five (5) years old or younger or three (3) children who are two (2) years old or younger.

8. With respect to kinship homes, DFS may exceed the capacity restrictions set forth in Consent Decree §§ II.D.5–7, provided that the licensing unit conducts an assessment of the kinship home's ability to adequately accommodate the placements before the exception is made and documents that assessment in the kinship parents' record. If the licensing unit determines that the kinship home can accommodate the placements only if appropriate supports and services are provided, DFS shall provide such supports and services. Under no circumstances shall the number of children in the kinship home exceed two (2) above the kinship home's licensed or certified capacity. Under no circumstances shall there be more than five (5) children who are five (5) years old or younger or three (3) children who are two (2) years old or younger.

9. Each class member's social worker shall document, in writing why a particular alternative care placement has been chosen for that child.

10. Each alternative care placement must be approved, in writing, by a supervisor with knowledge of the case.

11. A child may remain in temporary foster care status for longer than thirty (30) days under the following circumstances:

a. The child will be released from DFS custody within the next thirty (30) calendar days.

b. The child will be moving to a specified, available placement within the next thirty (30) calendar days.

c. The Family Court has ordered that the child remain in a designated placement for a period of time longer than thirty (30) days.

## E. Pre–Placement Process and Supervision of the Placement

1. Relevant information to be provided to a class member pursuant to Consent Decree § II.E.1 shall include as much information as is appropriate for the child's age about the foster home, its composition, the location of the foster home and the school the child will be attending. If possible, DFS shall provide the child with a photograph of the prospective foster family.

2. DFS shall help each class member with the trauma of separation from his/her family and his/her placement in DFS custody.

3. Relevant information to be provided to alternative care providers pursuant to Consent Decree § II.E.1 shall include, but is not limited to, reasons for the child's placement, the child's permanency planning goal, the child's medical history, the child's school placement, a description of the child's medical, psychological, educational and behavioral problems, if any, the child's service needs, the steps DFS shall be taking to meet those needs, and the services DFS shall provide to the alternative care providers, if any, to assist them in caring for the child.

4. If a placement is an emergency placement as defined in Operational Guide II.E.11, information may be provided to the class member and the alternative care provider either prior to or at the time of placement.

5. The following persons shall be present at the pre-placement visit mandated by Consent Decree § II.E.2:

a. The child.

b. The child's social worker.

c. The alternative care provider(s).

6. The child's parents/caretakers shall be present at the pre-placement visit if available and if appropriate based on the child's permanency planning goal or the circumstances of the child's placement.

7. Other children and persons living or working in the home should be present at the pre-placement visit if available.

8. The child's social worker shall schedule the pre-placement visit so that all individuals listed in ¶ 5 above are present and the maximum number of individuals listed in ¶¶ 6 and 7 above may attend.

9. Pre-placement visits with children who are being released from a medical hospital or facility to which they were admitted for non-psychiatric reasons shall occur at least twenty-four (24) hours prior to placement but do not have to occur in the foster home.

10. Pre-placement visits for children who are being released from residential treatment facilities, psychiatric facilities or medical facilities to which they were admitted for psychiatric reasons shall take place pursuant to plans developed by DFS and the discharging facility.

11. Pre-placement visits do not need to occur if the placement is an emergency placement. For purposes of this section, an emergency placement is defined as a placement that occurs under the following circumstances:

a. the child is in imminent danger in his/her current placement and must be removed immediately, or

b. DFS receives less than seventy-two (72) hours notice of the need to place the child.

12. Children who are already residing in a particular placement when the Family Court orders that they be placed in that placement are exempt from the pre-placement visit requirement.

13. If a child is placed in a new alternative care placement on a Friday night, Saturday or holiday, DFS shall provide that child with the twenty-four (24) hour visit mandated by Consent Decree §§ II.3.a and II.4.a on the next business day.

14. Another worker with knowledge of the child may be designated to make the visits required by Consent Decree §§ II.E.3 and II.E.4 only if the child's worker is on leave and the fact that he/she is on leave has been documented. A worker is on leave when he/she has not reported for work because he/she is on annual leave, maternity leave, sick leave, compensatory leave, leave without pay, military leave, or administrative leave. With respect to Consent Decree §§ II.E.3.a and II.E.4.a, the supervisor of the child's regular worker shall make the twenty-four (24) hour visit if the regular social worker cannot do so for reasons other than those set forth above. If the foster family is unavailable due to family emergency or vacation, the child's worker shall make the twenty-four (24) hour visit within twenty-four (24) hours of the family becoming available.

15. Class members in residential treatment facilities located more than seventy-five (75) miles from the main office of the Jackson County DFS are exempt from the visitation requirements of Consent Decree § II.E.4. Instead, the child's social worker shall attend periodic reviews of the child's course of treatment convened by the residential treatment facilities.

F. *Prohibition on the Use of Inappropriate Discipline of Children and Investigation of and Responses to Suspected Incidents of Inappropriate Discipline, Neglect and Abuse.*

1. To assist it in achieving compliance with the Consent Decree section, DFS shall implement Panel Recommendation 43, including its tasks and products.

2. If the investigation into an incident of abuse, neglect or inappropriate discipline results in a finding of "probable cause" (substantiation), or a finding of "unsubstantiated, but preventive services indicated," the team referred to in Consent Decree § II.F.6 shall meet within five (5) business days of the conclusion of the investigation.

3. The facts surrounding an incident of abuse, neglect or inappropriate discipline, including any findings made at the conclusion of the investigation, shall remain in the child's record and the record of the alternative care providers even if the report is determined to be unsubstantiated.

4. For purposes of Consent Decree § II.F.5, normal Child Abuse/Neglect Procedures are defined as those set forth in the Missouri DFS Child Abuse/Neglect Investigation Handbook.

5. For purposes of Consent Decree §§ II.F.4 and II.F.5, specialized workers are defined as workers assigned to the Out of Home Investigation Unit under the supervision of the DFS Central Office.

6. If services are provided to or corrective actions taken by alternative care providers who are the subject of reports of abuse, neglect or inappropriate discipline, documentation of those services and corrective actions shall be placed in the alternative care providers' record.

## G. Providing Adequate Supports

1. To assist it in achieving implementation of the Consent Decree, DFS shall implement Panel Recommendation 22, including its tasks and products.

2. Collaborative activities by DFS with foster and kinship parents shall include, but are not limited to:

 a. Making efforts to develop interagency agreements in order to increase and streamline foster parent, kinship parent and foster child access to:

 (1) Women, Infants, Children (WIC) Program.

 (2) Local public health services.

 (3) First Steps Program.

 (4) Immunization programs offered by and through the Department of Health.

 b. Directing and supporting foster parent ombudsperson activities to enhance material support and assistance for foster parents, kinship parents and foster children from businesses, churches and civic organizations in the Jackson County, Missouri area. Furthermore, DFS actively shall seek out increased civic support for the foster parenting program in Jackson County.

 c. Enhancing the availability of free and/or low-cost respite care and child care services that are available to foster and kinship parents.

 d. Providing support to programs and stores operated by foster, kinship and adoptive parents which provide clothing, food, and other items for active foster parents.

3. The foster and adoptive parent ombudspersons shall be available to assist any foster, kinship and prospective adoptive parent who wishes to raise any issue with DFS, including, but not limited to, permanency planning concerns and supports and services the foster, kinship or prospective adoptive parent may need to better understand and carry out his/her role.

## III. HEALTH CARE SERVICES

### A. Health Care Services

1. For children two (2) years old and younger, examinations required by the Healthy Children & Youth Program (HCY) after the initial thirty (30)–day examination shall be deemed to be in compliance with Consent Decree § III.A if received within fifteen (15) days of the times specified by the Program. For children over the age of two (2), examinations required by HCY's examination schedule after the initial thirty (30)–day examination shall be deemed to be in compliance if received within thirty (30) days of the times specified by the Program.

2. Specialized and follow-up health care services received within a reasonable time of the period specified by the health care provider shall be deemed to be in compliance with Consent Decree § III.A.4.

### B. Health Care Plan

1. At a minimum, each health care plan mandated by Consent Decree § III.B.1 shall include the following:

 a. Preliminary and final diagnoses.

 b. Required medications.

c. Follow-up appointments.

d. Required medical or specialized services.

2. At a minimum, children with serious medical problems shall have their health care plans reviewed at least every two (2) months and revised as needed. All other children shall have their health care plans reviewed at least every six (6) months and revised as needed.

3. Each child's health care plan shall be made part of the child's medical record and Comprehensive Permanency Plans.

### C. Health Care History and Health Care Records

1. To collect all available health care information about a child as mandated by Consent Decree § III.C.1, DFS shall obtain relevant information from the child's family and records from the child's previous health care providers, and ascertain whether the child is currently on medication and has or has had:

a. Medical problems, including chronic ailments or childhood illnesses, and dental, eye or hearing problems.

b. Inoculations and immunization.

c. Psychological problems.

d. Allergies.

2. To comply with Consent Decree § III.C.3, the child's social worker shall, at a minimum, provide a summary of available health care information, including the child's health care plan, to:

a. Foster and kinship parents at the time of placement or one week after the plan is developed.

b. To the child's family at the time the child is returned home.

c. To those service providers providing services to the child that are related to the child's health care problems. The health care plan, however, shall only be provided if appropriate.

### D. Medical Case Management

1. To assist it in achieving implementation with the Consent Decree, DFS shall implement Panel Recommendations 25 and 26, including their tasks and products.

2. The Medical Care Oversight Committee contemplated by Panel Recommendation 25 shall include representatives from the Family Court, Missouri Foster Care and Adoption Association and the current Jackson County Medical Care Coordinator. The Committee may seek technical assistance from the community as necessary and make recommendations to DFS for the appointment of additional community members.

3. DFS shall take steps to reduce duplicative and overburdensome paperwork requirements associated with medical case management.

### IV. DEVELOPMENT OF PERMANENCY PLANS AND PERMANENCY PLANNING GOALS

### A. Permanency Planning Guide

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 53, 64 and 67, including their tasks and products.

2. The permanency planning practice guide mandated by Consent Decree § IV.A.1 shall be submitted to plaintiffs and the G.L. Monitoring Committee for review and comment prior to its adoption and publication.

### B. Preliminary Service Needs Determination

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 41 and 55, including their tasks and products.

2. The placement of children who enter DFS' custody on Friday night, Saturday or a holiday shall be reviewed on the next business day.

3. With respect to Consent Decree § IV.B.1, DFS shall make a recommendation to the Family Court on or before the next business day that a child be returned home if it determines that out-of-home placement is not necessary.

### C. Preliminary Planning Conference

1. The social worker assigned to the child, a supervisor with knowledge of the case, and, if the child was the subject of a report of child abuse or neglect, the social worker assigned to investigate/assess that report, shall attend the Preliminary Planning Conference mandated by Consent Decree § IV.C.1.

2. DFS shall invite to the Preliminary Planning Conference the child's parents/caretakers and the child, if DFS determines that the child's presence would be appropriate. DFS shall facilitate the attendance of the child's parents/caretakers in the conference. If parents/caretakers do not attend, DFS shall document reasons for non-attendance and the attempts to facilitate attendance.

3. DFS shall notify the child's guardian ad litem/attorney and the attorney for the child's parents/caretakers of the date, time and place of the conference if DFS is aware that such individuals have been retained, assigned or appointed to the case.

### D. Preliminary Permanency Plan

1. The service assessments required by Consent Decree §§ IV.D.1.b, IV.D.1.e. and IV.D.1.g shall include, but are not limited to, assessments of the child's medical, psychological, behavioral and educational needs.

2. If the preliminary plan does not provide for a weekly parent/child or child/sibling visitation schedule, the reasons for having a different schedule shall be documented in the Preliminary Permanency Plan.

3. The Preliminary Permanency Plan shall be signed by the those persons in attendance at the Preliminary Planning Conference who are in agreement with the plan. If an individual attending the conference is not in agreement with the plan, his/her dissent and the reasons therefore shall be noted on the plan. DFS shall develop a procedure for reviewing and acting upon dissents.

4. After it is completed, the Preliminary Permanency Plan shall be submitted promptly to the Family Court, the child's parents/caretakers and the child's alternative care providers. It also shall be submitted to the child's guardian ad litem/attorney and the attorneys for the parents/caretakers if/when such individuals have been retained, assigned or appointed.

### E. Comprehensive Permanency Planning Conference

1. DFS shall provide each member of a child's Permanency Planning Review Team with written notice of the date, time and location of the Comprehensive Permanency Planning Conference at least ten (10) working days prior to the conference. Those team members whose identity and/or location is not known to DFS ten (10) working days prior to the conference shall be given notice of the conference by telephone as soon as DFS becomes aware of their identity and/or location.

2. DFS shall facilitate the attendance of the child's parents/caretakers in the conference. If parents/caretakers do not attend, DFS shall document reasons for non-attendance and the attempts to facilitate attendance.

3. The Comprehensive Permanency Planning Conference may be postponed at the discretion of the Program Administrator or his/her designee if a significant number of Permanency Planning Review Team members cannot attend. Under no circumstances, shall the Comprehensive Permanency Planning Conference be held more than forty-five (45) days after a child has entered DFS custody.

4. A child age twelve (12) or over may waive his/her presence at the Preliminary Planning Conference or may have his/her presence waived by his/her guardian ad litem/attorney.

5. A child, under age twelve (12), may have his/her presence waived by mutual consent of his/her guardian ad litem/attorney and social worker.

### F. Comprehensive Permanency Plan

1. The statutes and regulations referred to in Consent Decree § IV.F.2 are those in existence in January 1994, or as subsequently amended. Proposed amendments to the

state regulations shall be submitted to plaintiffs and the *G.L.* Monitoring Committee for review and comment prior to their publication.

2. If a child's first Comprehensive Permanency Planning Conference is not held within thirty (30) days of the child's entry into DFS custody for the reasons set forth in Operational Guide § IV.E.3, the child's Comprehensive Permanency Plan shall be developed no later than forty-five (45) days from the child's entry into DFS custody.

3. The comprehensive service assessment required by Consent Decree § IV.F.3.b shall include, but is not limited to, an assessment of the child's medical, psychological, behavioral and educational services.

4. The Comprehensive Permanency Plan shall be signed by each member of the child's Permanency Planning Review Team in attendance and in agreement with the plan. If a member of the team is not in agreement with the plan, his/her dissent and the reasons therefore shall be noted on the plan. DFS shall develop a procedure for reviewing and acting upon dissents.

5. After it is completed, the Comprehensive Permanency Plan shall be submitted promptly to the Family Court, the child's parents/caretakers, the attorneys for the parents/caretakers (if such attorneys have been assigned or retained), the child's guardian ad litem/attorney and the child's alternative care providers.

## G. Written Service Agreements

1. Written Service Agreements are agreements between DFS and appropriate persons based on the child's permanency planning goal. The Written Service Agreements shall set forth with particularity the roles and responsibilities of each person/party to the agreement with regard to implementation of the child's Comprehensive Permanency Plan.

2. Each Written Service Agreement shall, at a minimum, specify the following:

a. The steps to be taken by the parties to the agreement to meet the interim goals and objectives set forth in the child's Comprehensive Permanency Plan.

b. The individuals (designated by name or title) responsible for taking the steps set forth above.

c. Time frames within which the above steps will be taken.

d. Time frames and mechanisms for measuring progress in achieving goals and objectives and evaluating service intervention.

3. The facts and circumstances of a child's case may require that there be more than one Written Service Agreement.

a. If a child's permanency planning goal is reunification, DFS shall develop a Written Service Agreement with the child's parents/caretakers and, if appropriate, the child.

b. If a child's permanency planning goal is independent living, DFS shall develop a Written Service Agreement with the child, and if appropriate, the child's parents/caretakers.

c. If a child's permanency planning goal is guardianship, DFS shall enter into a Written Service Agreement with the child's potential guardian, if identified, the child's parents/caretakers, if appropriate, and/or the child, if appropriate.

d. If a child's permanency planning goal is adoption, DFS shall enter into a Written Service Agreement with the child's adoptive resource, if identified, the child's parents/caretakers, if appropriate, and/or the child, if appropriate.

4. If the child's goal is independent living, the Written Service Agreement shall include a specific plan for the development of an alternative living arrangement when the child leaves alternative care and the supports necessary to make that living arrangement successful.

5. Each Written Service Agreement shall be signed by all parties to the agreement or their agent/representative. If any party refuses to sign and does not agree with the Written Service Agreement, the social worker shall document that party's disagreement and the reasons therefore.

### H. Six–Month Permanency Planning Review

1. DFS shall provide each member of a child's Permanency Planning Review Team with written notice of the date, time and location of a six (6)–month Permanency Planning Review at least ten (10) working days prior to the conference. Those team members whose identity and/or location are not known to DFS ten (10) working days prior to the conference shall be given notice of the conference by telephone as soon as DFS becomes aware of their identity and location.

2. DFS shall facilitate the attendance of the child's parents/caretakers in the conference. If parents/caretakers do not attend, DFS shall document reasons for non-attendance and the attempts to facilitate attendance.

3. The Comprehensive Permanency Plan resulting from each six (6)–month Permanency Planning Review shall be signed by each team member in attendance and in agreement with the plan. If a member of the team is not in agreement with the plan, his/her dissent and the reasons therefore shall be noted on the plan. DFS shall develop a procedure for reviewing and acting upon dissents.

4. The Comprehensive Permanency Plan resulting from each six (6)–month Permanency Planning Review shall be submitted promptly to the Family Court, the child's parents/caretakers, the child's guardian ad litem/attorney, the attorneys for the parents/caretakers and the child's alternative care provider.

5. A child's social worker may change the interim goals and objectives set forth in a child's Comprehensive Permanency Plan prior to a meeting of the child's Permanency Planning Review Team if the child's and/or family's circumstances indicate that such a change is warranted and the worker's supervisor has approved the changes. A child's social worker may change the child's permanency planning goal prior to a meeting of the child's Permanency Planning Review Team if the worker's supervisor and the child's guardian ad litem/attorney each approve the change.

### I. Permanency Planning Goals

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendation 64, including its tasks and products.

2. Class members who are fourteen (14) or fifteen (15) years old may be assigned a permanency planning goal of independent living if they have stated that they do not wish to be adopted or have a guardian appointed and it has been documented that adoption or guardianship is not in the child's best interest.

### J. Adoption Training and Information Systems

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 62 and 67, including their tasks and products.

2. At a minimum, the adoption training mandated by Consent Decree § IV.J.1 shall address the following topics: determining adoptability, preparing children for adoption, recruiting adoptive families and matching children with adoptive resources.

3. The curriculum used for the training mandated by Consent Decree § IV.J.1 and any revisions thereto shall be submitted to plaintiffs and the G.L. Monitoring Committee for review and comment.

### K. Adoption Planning Conference

1. The child's social worker and adoption worker shall attend the planning conference mandated by Consent Decree § IV.K.1. If the child's social worker is performing adoption functions and there is no adoption worker, the social worker's supervisor shall attend. The child's guardian ad litem/attorney, alternative care provider (if appropriate) and services providers (if appropriate) shall be invited to attend the adoption planning conference.

### L. Adoption Plan

1. For purposes of the Adoption Plan, the steps to be taken to find the child an adop-

tive home shall include, but are not limited to, the following:

a. A determination of whether the child's current foster or kinship parents are interested in adoption, and if they are, a prompt determination of their appropriateness as adoptive resources and the prompt completion of a home study.

b. If the current foster home is not an available resource, prompt preparation of an adoptive profile of the child and review of currently approved adoptive studies to determine if there are appropriate resources.

c. If there are no appropriate homes among existing adoptive studies, child specific adoption recruitment, including, at a minimum, referring the child to the Adoption Exchange of Missouri and specialized adoption placing agencies and agencies under contract with DFS for child specific recruitment.

d. If referral to the exchanges set forth in (c) above does not result in an adoptive match within sixty (60) days, entering into child-specific contractual agreements with two (2) additional adoption exchanges or child placing agencies.

2. The steps to be taken once an adoptive resource has been located shall include, but are not limited to, the following:

a. Prompt notification of the prospective adoptive parents of a match.

b. Prompt commencement of pre-placement visits between the child and the prospective adoptive parents.

c. An assessment of post-adoptive services needs.

3. If the child's social worker is performing adoption functions and there is no adoption worker, DFS shall be considered in compliance with Consent Decree §§ IV.L.1.f and IV.L.2 if the social worker provides visits in accordance with Consent Decree §§ II.E.3 and II.E.4 and has two (2) contacts per month with the child's adoptive resource (if one has been located). One (1) contact shall be face-to-face, if possible. In addition, the child's social worker shall be expected to maintain periodic and regular contact with

the child's guardian ad litem/attorney as required by Consent Decree §§ IV.L.1.f and IV.L.2.

4. If the child has both a social worker and an adoption worker, DFS shall be in compliance with Consent Decree § IV.L.1.f and IV.L.2 if the adoption worker visits with the child at least once each month and has two (2) contacts per month with the child's adoptive resource (if one has been located). One (1) contact shall be face-to-face, if possible. In addition, the child's adoption worker shall be expected to maintain periodic and regular contact with the child's alternative care providers and guardian ad litem/attorney as required by Consent Decree § IV.L.1.f and IV.L.2.

## V. PERMANENCY PLANNING IMPLEMENTATION

### A. Staff Caseloads, Supervision and Training

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 11 and 42, including their tasks and products.

2. A social worker will be considered to have received adequate supervision if he/she meets with his/her supervisor and unit according to Panel Recommendation 11, Task 5.

3. DFS shall submit the curriculum to be used for the training mandated by Consent Decree §§ V.A.6 and V.A.7 and any revisions thereto to plaintiffs and the G.L. Monitoring Committee for review and comment.

4. DFS shall submit the curriculum to be used for the training mandated by Consent Decree § V.A.8 to plaintiffs and the G.L. Monitoring Committee for review and comment. By January 1995, the curriculum shall be incorporated into the pre-service/orientation training provided to all new social workers. All workers receiving such training mandated by Consent Decree § V.A.8 shall be exempt from the thirty (30)–hour annual in-service training requirement for calendar year 1995.

*B. Unit Structures and Managerial Personnel*

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 1, 3, 13, 22, 54 and 63, including their tasks and products.

*C. Management Plan*

1. In formulating the Management Plan for FY 95, FY 96 and FY 97, DFS shall give special priority to those items that the Panel's Recommendations identify as needing such attention, including, but not limited to, specialized staff training needs identified in Panel Recommendations 14, 52 and 62.

2. The Panel Recommendations attached to the Operational Guide and incorporated by reference shall function as the framework for needs assessment required by Consent Decree § V.3.a during the first, second and third years that Management Plans are developed and implemented.

3. If DFS undertakes the activities or accomplishes the tasks mandated by the Management Plan within a reasonable time after the time frames set forth in the Management Plan, it shall be deemed to be in compliance with Consent Decree § V.C.5.

*Staff Recruitment and Retention Component*

4. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 8, 9 and 10, including their tasks and products.

*Foster and Adoptive Parent Recruitment and Foster Parent Retention Component*

5. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 19, 20, 21, 22, 58, 63 and 65, including their tasks and products.

6. The needs assessment conducted pursuant to the Foster and Adoptive Parent Recruitment and Foster Parent Retention component of the Management Plan shall include, but is not limited to, the following:

a. A determination of the number of emergency foster homes that are needed.

b. A determination of the number of professional-level foster homes and adoptive homes that are needed to accommodate children with medical, emotional or behavioral problems.

c. An identification of the reasons foster parents are leaving the system.

*Staff, Foster Parent and Kinship Parent Training Component*

7. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 13, 14, 16, 24, 28, 36, 52 and 62, including their tasks and products.

8. Training provided by vendors shall be consistent with DFS policy and procedures.

*Resource Development Component*

9. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendation 60, including its tasks and products.

10. At a minimum, the Resource Development component of the Management Plan shall address the following issues as they relate to class members, their families, their alternative care providers and their service providers:

a. The Jackson County Office's systemic resource needs.

b. The development of sufficient evaluative resources (including, but not limited to medical, developmental, emotional and psychological resources) so that comprehensive assessments of a child's service needs can be obtained as soon as possible after that child has entered DFS custody.

c. Resources needed to implement each child's Preliminary Permanency Plans and Comprehensive Permanency Plans and to accomplish each child's permanency planning goal, including, but not limited to, adoption and educational advocacy resources.

d. The development of a sufficient number of service providers and supports, including, but not limited to, alternative care providers other than foster and adoptive parents. Initial targets for the first Resource Development component of the Management Plan shall include the recruit-

ment of fifty (50) additional professional-level foster homes by September 1995; the recruitment of fifteen (15) additional emergency foster homes by September 1995; and the development of wraparound service capacity for twenty-five (25) class members by September 1996.

e. Resources and administrative supports needed by licensing, placement and adoption staff to operate in accordance with reasonable professional standards.

*Manual and Automated Management Information Systems Component*

11. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 5, 21, 30, 31, and 67, including their tasks and products.

*Quality Assurance Component*

12. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 34, 36 and 37, including their tasks and products.

## VI. *MISCELLANEOUS PROVISIONS*

### B. *Remedial Actions*

1. To assist it in achieving compliance with the Consent Decree, DFS shall implement Panel Recommendations 59 and 61, including their tasks and products.

2. The plan for intensive adoptive recruitment efforts mandated by Consent Decree § VI.B.2 shall include a review of current adoptive profiles for accuracy and completeness and, with assistance from the children's guardians ad litem/attorneys, a revision of adoptive profiles that are more than six (6) months old.

### C. *Monitoring*

1. DFS shall provide to plaintiffs and the *G.L.* Monitoring Committee periodic reports on progress it has made in implementing the Panel Recommendations attached to the Operational Guide and incorporated by reference.

Dated: October 18, 1994

/s/ Gary Stangler
Gary Stangler
Director
Department of Social Services
State of Missouri

/s/ Carmen K. Schulze
Carmen K. Schulze
Director
Division of Family Services
Department of Social Services
State of Missouri

/s/ Mary Browning
Mary Browning
Deputy Director
Division of Legal Services
Department of Social Services
221 West High Street
Jefferson City, Missouri 65101
Missouri Bar No. 34633

/s/ Richard L. Matt
Richard L. Matt
Deputy Director
Children's Services
Division of Family Services
Department of Social Services
State of Missouri

/s/ Kathleen Dowd
Kathleen Dowd
Program Administrator
Children's Services
Division of Family Services,
 Jackson County Office
Department of Social Services
State of Missouri

/s/ Robert Presson
Robert Presson
Assistant Attorney General
221 West High Street
Jefferson City, Missouri 65101
Missouri Bar No. 23256

/s/ Robin L. Dahlberg
Robin L. Dahlberg
Senior Staff Counsel
Children's Rights Project
American Civil Liberties Union
132 West 43rd Street
New York, New York 10036

/s/ Dean Whipple
Dean Whipple, Judge
United States District Court

/s/ Fred Rich
Fred Rich
Legal Aid of Western Missouri
1005 Grand Street
Kansas City, Missouri 64106
Missouri Bar No. 28152

SO ORDERED:

## ATTACHMENT TO MODIFY CONSENT DECREE OPERATIONAL GUIDE:
### PANEL RECOMMENDATIONS
#### INDEX

Panel Recommendation #1 .................... 287
Panel Recommendation #3 .................... 288
Panel Recommendation #5 .................... 288
Panel Recommendation #8 .................... 289
Panel Recommendation #9 .................... 289
Panel Recommendation #10 .................... 290
Panel Recommendation #11 .................... 290
Panel Recommendation #13 .................... 291
Panel Recommendation #14 .................... 291
Panel Recommendation #16 .................... 292
Panel Recommendation #19 .................... 292
Panel Recommendation #20 .................... 293
Panel Recommendation #21 .................... 294
Panel Recommendation #22 .................... 295
Panel Recommendation #24 .................... 296
Panel Recommendation #25 .................... 297 *
Panel Recommendation #26 .................... 298
Panel Recommendation #28 .................... 299
Panel Recommendation #30 .................... 300
Panel Recommendation #31 .................... 300
Panel Recommendation #34 .................... 300
Panel Recommendation #36 .................... 301 *
Panel Recommendation #37 .................... 301 *
Panel Recommendation #41 .................... 301
Panel Recommendation #42 .................... 302
Panel Recommendation #43 .................... 302
Panel Recommendation #52 .................... 303
Panel Recommendation #53 .................... 303
Panel Recommendation #54 .................... 304
Panel Recommendation #55 .................... 304
Panel Recommendation #56 .................... 304
Panel Recommendation #58 .................... 304
Panel Recommendation #59 .................... 305
Panel Recommendation #60 .................... 305
Panel Recommendation #61 .................... 305
Panel Recommendation #62 .................... 305
Panel Recommendation #63 .................... 306
Panel Recommendation #64 .................... 306
Panel Recommendation #65 .................... 306
Panel Recommendation #67 .................... 307

\* No changes made to this panel recommendation.

---

*Recommendation #1:* Recruit and hire a full-time Program Administrator (complete) and hire a Deputy Program Administrator for Children's Services in Jackson County by September, 1994.

Description of Tasks and Products:

1. Missouri Department of Social Services (hereinafter, DSS) management has used an executive search firm to recruit candidates for the Program Administrator's (hereinafter, PACS) position and has hired a person for this position as of December 1, 1993. (Completed)

2. Arrange a structured orientation of the new Administrator to all the components of the Jackson County Division of Family Services (hereinafter, DFS), system: to local office and state agency responsibilities; to the need for broader community partnerships and the role of The Local Investment Commission (hereinafter, LINC); to the standards of care and services expected for all DFS clients; and to the plans for a high quality system of care spelled out by the National Panel. (Completed)

3. Recruit, select, and hire a Deputy Program Administrator for Children's Services, (hereinafter, Deputy PACS), for the Jackson County Office of the Division of Family Services (hereinafter, JCDFS). (December, 1994) (Note that this requires creating a position for the Deputy PACS, which the State DSS office has agreed to do.) (December, 1994)

*Recommendation # 3:* By September, 1995, establish a streamlined, more efficient organizational structure that provides consolidated management oversight and promotes continuity of care, thereby ensuring better communication among staff, clearer program direction, and more uniform accountability.

Description of Tasks and Products:

1. Under the new PACS, establish specifications for an organizational plan that accomplishes several major goals:

(1) Establishes closer functional relationships (i.e., referral arrangements, joint training, and use of common intake and assessment protocols) among the Intake and Investigations staff, the IFPS staff, and the Family–Based Services staff;

(2) Assures consistent management direction to alternative care staff;

(3) Clearly assigns responsibility for resource development and foster parent and adoptive parent recruitment and training activity;

(4) Promotes effective linkages between alternative care and adoption staff; and

(5) Provides for key administrative supports such as training and staff development, quality assurance and MIS. (March, 1995)

2. Use a small internal workgroup to review past organizational plans and the National Panel's recommendations and develop recommendations for the new PACS and State DFS. (March, 1995)

3. Develop a plan. (June, 1995)

4. Implement reorganization plan. (September, 1995)

5. One year after consolidation and reorganization of the JCDFS office is completed, conduct a performance audit of the new system to determine if desired results are being achieved and how better results can be achieved. (September, 1996)

*Recommendation # 5:* By December, 1995, implement recordkeeping processes and procedures which provide a basic standard of information about families and children served by JCDFS (including foster families).

Description of Tasks and Products:

1. The Quality Assurance Unit, with mentor assistance, shall conduct a quick-turn around study of the quality of current recordkeeping practices.

(1) A case record review protocol should be developed by December, 1994, to assess:

• Organization and completeness of case record

• Timeliness of information in record

• Quality of documentation in case record

• Ease of access to information

• Compliance with state recordkeeping requirements

(2) A statistically valid sample of records should be reviewed by June, 1995, using the protocol.

(3) Based on the review, the QA unit should recommend changes in recordkeeping practice to

• Eliminate duplication

• Ensure completeness of information according to the court order

• Ensure timeliness of recordkeeping

• Improve accessibility of information in the record that is needed for critical decision making

2. Changes in recordkeeping based on the review and prior to full MIS implementation shall occur by December, 1995.

3. Based on the review, the QA unit, in concert with the training unit, shall develop appropriate training modules on recordkeeping to address deficiencies in recordkeeping practice. Training on revised recordkeeping practices shall be incorporated into the pre-service training curricula and provided to all current workers by December, 1995.

*Recommendation # 8:* By December, 1994, institute an aggressive recruitment program to attract qualified candidates to fill vacant positions.

Description of Tasks and Products:

1. Develop and carry out an active and comprehensive recruitment plan to fill all existing vacancies at DFS and to ensure that all new vacancies are promptly filled with qualified workers.

 a. Identify/assign a staff person with overall responsibility for coordinating recruitment/retention activities. This function should take 25 percent of a senior staff person's time. The coordinator will be responsible for planning and implementing the recruitment/retention campaign, identifying obstacles and

tracking progress toward achieving a stable workforce. (December, 1994)

b. DFS shall develop and implement a recruitment plan which will contain but not be limited to the following actions:

• The development of a recruitment brochure by December, 1994, which describes the job of a social service worker in Jackson County DFS and the requirements and skills necessary to perform the job;

• Participation by DFS staff in local and regional job fairs;

• Outreach to schools of social work in the surrounding areas and direct recruitment using alumni who are current staff members;

• Outreach to organizations such as the National Association of Social Workers (Missouri–Kansas unit);

• A recruitment media campaign that includes newspaper announcements;

• Partnerships with social work schools to sponsor internships and special training stipends for BSW candidates in their last year of school in return for agreements to work at DFS; and

• Special efforts to attract workers who ethnically and culturally reflect the population served (*e.g.,* outreach to the Association of Black Social Workers; targeted advertisements in community newspapers and professional newsletters).

The recruitment plan shall be fully operationalized by March, 1995.

*Recommendation # 9:* DFS shall take all steps within its control, in cooperation with accredited universities in Missouri and Kansas, to develop an MSW program that is operational by September, 1995, and is designed specifically around the needs of JCDFS staff.

1. An implementation plan shall be developed by December, 1995, which allows for:

• Stipends for existing supervisors and workers to obtain their MSWs, tied to a commitment to remain an employee of the agency.

- Consideration of entrance requirements to provide opportunities for long term workers as well as new workers, and to allow entrance based in part on job experience and performance and not solely on past academic records.
- A plan to offer a significant portion of the core curriculum on-site at DFS or at a convenient location in Jackson County.
- A financing plan for the program which fully utilizes Title IV–E training opportunities.

2. After preliminary planning has occurred and the feasibility established, existing staff should be surveyed to determine the numbers of persons interested. The program should be geared to accommodate as large a portion of that interest as is feasible, recognizing that the program may be small during its first year and that the number of new enrollees may be increased after the first year's experience.

3. Work shall proceed so that initial coursework leading toward the full degree program can begin in the Fall of 1995. (September, 1995)

*Recommendation # 10:* By December, 1994, institute other practices to attract and retain a qualified staff by providing administrative supports to workers.

Description of Tasks and Products:

1. To provide administrative supports and resources to social workers and supervisors in DFS covered by Consent Decree Section V.A.:

 a. DFS shall determine the number and level of resources needed for:

 - Adequate office space for all staff;
 - Private interview areas for workers and families;
 - Office equipment and supplies (*e.g.,* copy machines, fax, etc.);
 - Car seats for transporting children;
 - Personal computers and training for workers in how to use them; and
 - Worker security.

 b. Based on the review, DFS shall develop and implement an annual plan with resource projections for improving the numbers and kinds of available administrative supports. This plan should be developed by June, 1994, and annually thereafter so that funds necessary to implement it can be budgeted in the annual budget cycle.

 c. DFS shall work with LINC to determine the extent to which these needs can be met with resources available from the community and to access community resources. (December, 1994)

*Recommendation # 11:* By December, 1994, improve supervisory and other supports available to social service workers. This recommendation applies to social service workers and supervisors covered by the Consent Decree Section V.A.

Description of Tasks and Products:

1. DFS shall provide opportunities for workers to have regular case staffing and consultation on individual cases that are complex. This includes meetings with "master workers" [1] within DFS as well as professional consultation from skilled practitioners in the community. To implement this, in the short term, DFS shall identify a number of qualified local clinicians who are willing to be available a half day a month to provide clinical consultation. A multidisciplinary team composed of a mental health professional, an educational specialist, and a clinical social worker should be put together and a master schedule developed so that all supervisory units (consisting of a Supervisor I and social service workers) have opportunities on a rotating basis to staff difficult cases with the consultants.

 Over the next year, DFS should formalize consultant contracts as needed, for the services of a multidisciplinary team who can be made available to workers

---

1. Master workers are defined as workers meeting the requirements to be a Social Service Worker III as set forth in the 1994 proposed job classification.

and supervisors on a regular basis for individual and group consultation. (December, 1994)

2. DFS shall establish a "partner workers" program for new supervisors so that they are paired with experienced supervisors for assistance and support. (December, 1994)

3. No supervisors shall carry caseloads except on an emergency basis or for short time periods as necessary for their own professional development. (December, 1994)

4. DFS management shall monitor the caseloads of supervisors on a quarterly basis to assure that supervisors are only carrying caseloads on a temporary basis when a worker leaves, or as part of a professional development plan, approved in writing by the appropriate Supervisor III. (December, 1994)

5. Supervisors shall schedule regular group meetings with all of their staff no less frequently than once every two weeks. Regularly scheduled supervisory meetings with individual workers shall be held weekly for all workers in their first year of employment, and at least once every two weeks thereafter. (December, 1994)

6. DFS shall arrange for or contract for the provision of management training for all supervisors in order to improve their management and supervisory skills (see Training Section).

*Recommendation # 13:* By December, 1994, redefine the role and functions of the Jackson County Training and Staff Development Unit so that it has greater capacity to develop and implement a comprehensive training plan through the direct provision of training and/or accessing/purchasing of external training resources.

Description of Tasks and Products:

1. Redefine the role, functions and authority of the Training Unit by December, 1994, in accordance with this recommendation. This will involve negotiating a changed relationship with the state office of DFS. The role of the Jackson County Training and Staff Development Unit should be to implement training in accordance with a local plan which incorporates staff requirements but is geared to local needs.

2. Staff the unit, initially with a Coordinator of Training and Staff Development and two training specialists. The staff should have the capacity and responsibility to develop the training plan and coordinate, purchase and/or directly provide training. Additional staff may be needed in the future in light of the emphasis on training throughout this plan. However, the Panel also emphasizes that most training can be done successfully under contract, rather than by hiring additional staff. (December, 1994)

3. Renegotiate the state/local relationship by December, 1994, so that the Training and Staff Development Unit has greater responsibility to pursue a local training agenda, subject to an approved plan.

4. The State DFS shall allocate an annual training budget to Jackson County to be spent in accordance with an annually approved training plan. The first allotment shall be made for FY '95, based on a plan to be developed by December, 1994 (see recommendation # 14 below). Thereafter, the County shall receive an annual fiscal year budget allocation for training.

*Recommendation # 14:* By December, 1994, begin implementation of a comprehensive Annual Training Plan which incorporates a plan for meeting minimal training requirements for all staff.

The plan shall address in detail the scope of the training and the curricula, methods, and/or providers to be used to ensure:

- Pre-service training for all new staff and supervisors (a minimum of three weeks)
- Mandatory annual training for all frontline staff, supervisors, and management staff (a minimum of 30 hours) and clerical staff (a minimum of eight hours).

- Required pre-service training for foster and adoptive parents
- Mandatory training for foster parent on prevention of abuse and neglect of foster children and proper placement practices
- Provisions for specialized joint training between social service workers and Family Court workers; social workers and Family Court GAL units; social service workers and foster parents; and social service workers and medical care case managers
- Training on new policies and procedures as they are developed and implemented
- Specialized training in program areas such as risk assessment, decision making for permanency, adoption and independent living
- Specialized training in response to problems identified in QA reviews.

During this first year, the plan should give priority to frontline supervisors.

Description of Tasks & Products:

1. By December, 1994, develop the first training plan and budget. Thereafter, the plan should be revised annually to coordinate with the annual budget cycle.

*Recommendation # 16:* By March, 1995, develop and maintain a resource library for staff.

Description of Tasks and Products:

1. Assign lead responsibility for creation and maintenance of the resource library. (December, 1994)
2. Secure a first year budget of $10,000 from State DFS (to be supplemented with community resources). (December, 1994)
3. Catalogue currently available materials and purchase additional materials. (March, 1995)
4. Prepare quarterly listings for staff of new materials available in resource library and how to access them. (March, 1995, and on-going)

*Recommendation # 19:* By December, 1994, develop the internal capacity to plan and manage a comprehensive recruitment strategy for foster and adoptive parents, including maintaining a six worker/one supervisor recruitment and retention team.

Description of Tasks and Products:

1. *A recruitment and retention team.* DFS shall hire/assign a team of a minimum of six full-time persons and one supervisor in one supervisory unit with responsibility for developing and managing a comprehensive strategy and plan of action for recruiting foster and adoptive parents and for retaining foster parents. This represents an additional three full time positions for these responsibilities from the staff available in January, 1993 (two workers and one supervisor). (Complete)

These staff should have diverse skills as well as racial and ethnic backgrounds. They must be able to communicate effectively with many community groups, have a strong understanding of the nature and philosophy of foster care in Jackson County, and be able to manage an overall recruitment campaign with many different elements.

This team's responsibilities shall include:

- Designing and implementing a multi-year recruitment plan with specified annual goals and resource commitments, as described below;
- Developing necessary written materials for recruitment;
- Tracking progress of recruitment activities, monitoring rates of securing new foster and adoptive parents, and reducing turnover of foster parents;
- Working in partnership with all foster and adoptive parent groups (as well as individual foster and adoptive parents) in the implementation of these activities to ensure that their ideas and perspectives are incorporated;
- Coordinating foster and adoptive parent home studies, including overseeing any contract agencies performing these studies;

- Managing support resources for foster and adoptive parents, including overseeing funds for respite care;
- Organizing other supportive activities for foster parents, including community support groups, networks among foster parents, etc.;
- Reducing the turnover rate among foster parents, as described below;
- Reducing disruption in adoptive homes.

Staffing for this team shall be identified and assigned by December, 1994. (Complete)

2. *A recruitment budget.* DFS shall allocate an annual budget to support recruitment activities, covering at a minimum the following activities: a media recruitment strategy; costs required to respond to prospective foster and adoptive parents; costs of materials development; costs associated with a grass roots strategy for outreach to foster and adoptive parents; and consultation regarding marketing.

This amount for FY 1994 is estimated at $100,000. The first year costs will be awarded by LINC's Children's Services Committee. Additional years' budgets should be developed as part of DFS annual budget.

*Recommendation # 20:* Develop and implement a multi-year recruitment strategy and plan for adoptive and foster families with annual goals, tasks, and resource commitments.

Description of Tasks and Products

1. *Recruitment Goals.* As an essential first step in developing the recruitment plan, DFS must determine the numbers and kinds of foster and adoptive care resources it will need over the next year, and annually thereafter. This assessment will be based on the numbers and needs of children currently in care, a projection of the numbers and needs of children who will be entering care, and an assessment of the numbers of children currently freed for adoption and the numbers who can be annually expected to need adoption services. The numbers of new providers needed should be based on the Division's coming into compliance during the next year with licensing standards and requirements for limiting the number of young children (under 2 and preschool age) in individual foster homes.

The needs assessment shall establish a numerical target for recruitment of:

- family foster homes
- career foster homes, to meet the special medical, therapeutic, or behavioral needs of foster children
- permanent foster homes; and
- adoptive homes.

These assessments shall be done annually starting with September, 1994 and be used as input into the development of the annual recruitment work plan and the DFS annual budget.

2. *Comprehensive Plan.* By December, 1994, DFS, in conjunction with a community Task Force and LINC (see below) shall complete a comprehensive recruitment plan for foster and adoptive parents with quarterly numerical targets for the numbers and kinds of foster care resources to be developed.

The plan shall have the following elements:

— A media strategy to reach prospective adoptive and foster parents;

— Provision for use of master foster parents and others to do one-to-one and other personalized and grass roots recruitment strategies;

— Effective, brief written materials to communicate clearly why people should become foster and adoptive parents; the nature of children's needs; the rewards and satisfactions of foster and adoptive parenting; the steps to becoming a foster or adoptive parent; etc. (See Step 3, below).

— Targeted strategies for particular audiences, including churches, businesses, military personnel, federal employees, and civic associations;

— A neighborhood based intensive recruitment campaign assisted by a contracted community worker focusing on one or several targeted neighborhoods.

— Capacity to staff "events"—fairs, meetings, other large gatherings—where large numbers of people could learn about foster/adoptive parenting opportunities.

In future years, an annual plan will be developed by June 1 of each year, to coincide with the annual budget cycle.

3. *"User-friendly" materials.* DFS shall develop attractive and informative recruitment materials that can be used in the outreach and recruitment campaigns. These will include:

— Two brochures (one for prospective foster parents and one for prospective adoptive parents) explaining the need for foster/adoptive parents; the requirements and steps to becoming adoptive or foster parents; some human interest stories that will communicate the satisfactions of foster/adoptive parenting; etc. These materials should be culturally sensitive and clearly communicate the role and responsibilities of foster care providers;

— Materials to be given by one foster parent to other prospective foster parents, using the general theme of "I'm a Foster Parent; Why Don't You Consider Joining Me?"

— A one page handout explaining step-by-step how to become a foster/adoptive parent;

— Additional materials developed for specific audiences, specifically churches, the business community, and military personnel.

These materials will be developed, with review by community advisors, by December, 1994.

4. *Church-targeted recruitment.* DFS shall support the development and operation of a church-targeted recruitment program in Jackson County. Responsibility for this should be assigned to the recruitment unit, with an advisory group drawn from participating churches and the community. Agreement about how this recruitment strategy will proceed should be obtained by December, 1994.

*Recommendation # 21:* By March, 1995, DFS shall conduct orientation, pre-service training, and home studies of potential foster/adoptive families in a timely way in order to respond well to community interest and to meet established recruitment targets and court-ordered timelines for completion of foster and adoptive family studies.

Description of Tasks and Products:

1. *Orientation and pre-service training.* DFS will organize its orientation efforts to provide orientation every 30 days. This schedule will go into effect as of December, 1994.

Pre-service training will continue to be offered in a variety of formats, adapted to prospective foster parents' differing needs. These will include at least: (1) a provision for completion of required pre-service training through intensive weekend sessions; and (2) weekly evening sessions over a short period of time.

A monthly calendar for orientation and training should be developed and published, and made available to all prospective foster/adoptive parents, beginning December, 1994.

2. *Home studies and licensing.* DFS will consider contracting out some or all of its home studies and licensing for foster and adoptive parents, particularly relicensing assessments. This decision will be made after an assessment of the resources available to do this task; consideration of the possibility of contracting with JCDFS staff for overtime work; a phase-in schedule for shifting this responsibility to contract individual agencies; the impact on current DFS staff, and the new responsibilities for managing contract performance. A decision on this issue shall be made by Jackson County and central office DFS management by December, 1994.

Under any contract arrangement or using in-house staff, foster and/or adoptive

home studies must be completed within 90 days of foster parent application.

3. *Monitoring progress.* DFS shall track the progress of its recruitment activities monthly in terms of numbers and kinds of outreach activities conducted; numbers of persons participating in orientation; numbers of persons participating in pre-service training and numbers of families licensed and ready to receive children. DFS shall acquire and allocate a personal computer for purposes of tracking these activities, and shall secure the necessary software and design assistance to develop the tracking capability. This system shall be in place by December, 1995.

*Recommendation # 22:* Develop sufficient and appropriate supports in order to reduce the turnover among foster parents by 25 percent by June, 1995, and 50 percent by June, 1996.

Description of Tasks and Products:

1. *Establish a baseline of the turnover rate,* based on analysis of the turnover rate for the past 18 months by December, 1994.
2. *Identifying reasons for turnover.* DFS shall institute an ongoing process of exit interviews with foster parents who are leaving the system in order to determine the reasons for their leaving and the factors that may have contributed to unwanted turnover. Master foster parents should be engaged to help with these interviews. This information should be made available and taken into consideration in developing the annual recruitment plan and plans for supporting and sustaining foster parents. This interview process will begin by December, 1994.
3. *Materials useful to foster parents.* DFS shall prepare and disseminate annually a *Foster Parents Handbook* which specifies rights and responsibilities of foster parents, birth parents, provider agencies and DFS workers. The Handbook shall also specify the placement process; the rate and process for payment; the services to which children are entitled; the support services available for foster parents; expectations for worker, parental and sibling visitations; and the names and telephone numbers of key persons in DFS. Additionally, the Handbook shall outline a grievance procedure for foster parents. Foster parents should be involved in preparing this handbook. The first edition of this Handbook shall be issued by March, 1995.

4. *Needed supports.* To better support current foster care providers and minimize the need for replacements, the Division will establish and implement improved placement support services.

 a. *Respite care.* A sufficient number of respite care providers and slots shall be funded and established so that foster parents can access respite care for crisis situations and for a minimum of 15 hours per quarter for routine respite care.

 b. *Day care.* Day care services shall be made available for all working foster care providers, for providers who need day care as a respite, and for all children who can benefit from day care services.

 c. *Foster parent networks.* DFS shall develop and distribute a directory of foster care providers so that informal contacts can be established among foster care providers in the same neighborhoods.

 d. *Foster parent ombudsman.* Establish a more formalized foster parent/adoptive parent ombudsman function either by contracting with foster/adoptive parents and/or designating a JCDFS staff person to assume this function. (December, 1994)

 These supports shall be in place by December, 1994.

5. *Joint training between workers and foster parents.* DFS will ensure joint training opportunities for workers and foster parents, including pre-service training as well as required on-going training. All foster care workers will be

required to participate in 6 hours of joint training per year.

6. *Report to foster parents.* Each year, DFS administrators shall issue a brief written report to foster parents, indicating progress in accomplishing the goals listed here, in addressing other foster parent concerns, and in creating a climate of teamwork and mutual respect between foster parents and workers. The report shall be provided in advance and discussed at a meeting of all foster parents, as well as at meetings of the Jackson County Chapter of the Missouri Foster Care and Adoption Association. The first such report should be completed by May, 1995.

7. *Continuation of Ad Hoc Recruitment and Retention Committee.* DFS shall continue to hold meetings of the Ad Hoc Committee to discuss issues of concern to DFS staff, foster parents and the community and to advise DFS on ideas for resolution of those issues.

8. *Assessment of Progress in Meeting Goals,* of reducing turnover by 25% (June, 1995) and by 50% (June, 1996) from baseline established as above.

*Recommendation # 24:* Provide initial and ongoing training to all foster and kinship parents to assure that no child shall be placed in a person's home until that person has completed the necessary training and demonstrated a satisfactory mastery of the training curriculum, except as provided in Consent Decree Section II.B.1 and II.C.1.

Description of Tasks and Products:

1. *Training manager.* DFS shall appoint one person as the coordinator of all training developed and provided to all foster parents. This person will be responsible for ensuring that a core curriculum is developed and provided according to quality standards by all trainers under contract, and for ensuring that foster parents participate in the required number of training hours per year. Clarification of this staff assignment will be done by December, 1994.

2. *Training plan and contracts.* DFS shall develop and publish a plan (including written curriculum and necessary materials) to ensure that any person who seeks to become a foster parent will receive a minimum of 12 hours of training prior to having a child placed in his/her home; an additional 40 hours in the first two years of licensure, including training on prevention of abuse and neglect and inappropriate discipline; and 20 hours of training every two years thereafter. (This standard can be adjusted if DFS expands its pre-service training to include some of the material that would otherwise be provided in the first two years of licensure. In any case, each foster parent would have a minimum of 52 hours of training by the end of their second year of licensure.) This plan will identify core content that must be provided by all trainers under contract to DFS. Contracts with trainers will specify the required adherence to this core training content. Development of the core content will be identified by June, 1995.

The panel further recommends that a competitive RFP be developed to solicit proposals for delivering the core training. If possible, one contractor should be selected with the capacity to deliver all of the required core training. Other contractors can be used for supplemental and/or specialized training.

a. The recommended content of the foster parent training shall include but not be limited to:

● The roles, responsibilities, and legal rights of foster parents

● The role of foster parents vis-à-vis birth parents

● The rights and responsibilities of birth parents

● The impact of foster care on children, especially the meaning that loss and separation have for children in foster care and their parents

● The fundamentals of child development, especially developmental targets and the impact of abuse and neglect on development

- The concepts and practice of permanency planning
 - Care of foster children
 - — Emergency medical procedures
 - — Appropriate discipline and child behavior and management
 - — Management of children with HIV, AIDS, and drug exposure
 - — Meeting the special medical, educational, and psychological needs of children with disabilities;
 - — Advocating with the school and other agencies on behalf of children;
 - — Resources available to foster children (i.e., child care, independent living); special resources for high need populations such as the deaf
 - The functioning and adjustment of the foster family
 - Placement and payment procedures
 - Prevention of abuse and neglect in foster homes
 - The legal processes of the Family Court
 - Adoption—what it is and how it fits into permanency planning for a child
 - Transracial placements and cultural competency
 b. Where appropriate, specialized individual and/or group training should be provided to permit prospective foster parents to care for children with special needs, be they medical, behavioral, developmental, or emotional needs.

3. *Training calendar.* Develop a written schedule for all foster and kinship parent training no less frequently than quarterly.
 a. The schedule should be developed by the Director of Training in conjunction with the staff responsible for recruiting foster parents and should provide sufficient training opportunities so that training is offered no less frequently than every 30 days.

4. *Supports for foster and kinship parents in training.* DFS shall promote attendance of foster and kinship parents at training sessions through such activi-

ties as provision of baby-sitting for foster and kinship parents, reimbursements for monies paid to baby-sitters and transportation expenses, scheduling of training in locations that are accessible to foster and kinship parents and at convenient times, and recognition certificates for successful completion of training. These supports shall be available by December, 1994.

5. *Foster and Kinship parents' assessment of training.* DFS shall develop and disseminate a consumer evaluation of training offerings in which foster and kinship parents can rate the quality and usefulness of training offerings. Comments from these assessments shall be evaluated by the JCDFS, PACS and training manager, and appropriate suggestions thereafter shall be incorporated into future training. These procedures will be developed by December, 1994.

6. *Assessing foster and kinship parents' skill acquisition.* DFS shall ask the training contractor(s) to provide information on the extent to which individual foster and kinship parents have acquired the competencies and skills covered in the training. This statement by trainers will also identify areas in which the foster and kinship parent could benefit from further information, support, or mentoring from other foster and kinship parents. This statement shall be based on foster and kinship parents' activities during the course of training. Procedures for enabling trainers to provide such assessment will be developed by June, 1995.

*Recommendation # 25:* Until an alternative, revised approach is adopted, review and clarify the functions of all the major parties to the Alternative Medical Care Plan, including the Jackson County Medical Care Coordinator and staff, social workers, foster parents and the contracted medical care case management providers.

Description of Tasks and Products:

1. Establish a permanent Medical Care Oversight Committee comprised of Jackson County DFS management, the Divi-

sion of Medical Services, the Plaintiffs, LINC, the *G.L.* committee, and selected medical consultants. This committee will review the roles and responsibilities of the Medical Care Coordinator and the case management providers and propose changes/clarifications in the roles and functions of the respective parties. This work should culminate in written memoranda of understanding on the roles and responsibilities that are agreed to and signed by all parties. This process should be completed by December, 1994.

*Recommendation # 26:* Redesign, with recommendations and assistance from the Oversight Committee, the program model for medical care planning and case management that is incorporated into the Alternative Medical Care Plan (dated June 28, 1991).

Description of Tasks and Products:

1. Develop a program model to assure adequate development and review of medical plans for children in JCDFS custody, ensuring that medical case managers are an integral part of the planning and service delivery team for a child in alternative care. The recommended approach has the following elements:

 - All parties would agree that the current arrangement is ineffective, and that a new plan is needed.
 - A standing Oversight Committee would be established, with representatives from DFS management, the State Division of Medical Services, the Medical Care Coordinator, the Plaintiffs, LINC, the *G.L.* Committee, and one or two medical care experts not directly involved in these provider arrangements. Their first charge is to redesign the program model for assuring that children's medical needs are met to ensure that this function is (1) more closely integrated with the overall case planning done by JCDFS alternative care workers, and with the care provided by foster parents, and (2) more effective in producing im-

proved care and care plans for each child in JCDFS custody.

After this redesign is complete, the committee should continue to exist for the purpose of reviewing and assessing the provision of medical care to children in JCDFS custody, and recommending changes if the proposed strategy does not produce the intended results.

- The Oversight Committee would consider the following revised program model. One medical care specialist would be assigned to each alternative care supervisory unit, to work as a team with the workers in that unit. The specialist's role would be to assure that medical care needs of all children in JCDFS custody were met by (1) assisting the workers in that unit to develop a medical/health care plan for each child which is an identifiable component of each child's case plan, (2) work with foster parents, as necessary, to ensure that children with special medical needs had those needs met, and that the foster parent knew how to meet those needs and obtain necessary care, (3) provide more direct case management of a child's case, when medical conditions warranted it and when this responsibility was negotiated with the child's worker and the supervisor of that unit, and (4) work with birth parents around meeting medical needs when reunification is the plan. In effect, the medical specialists will be acting as consultants to each supervisory unit, and assuming more direct case management responsibility as necessary on an individual case basis. In addition, standards for adequate medical care for children in custody would be set (incorporating current standards as these are useful), and it would be the medical specialist's responsibility, with the unit supervisor, to ensure that these standards were met by each worker and each unit.

A medical specialist would also be assigned to the recruitment and reten-

tion unit, to ensure that the medical/health aspects of foster parenting were well-represented in recruitment, retention, and training activities.

This approach has several potential benefits. It would integrate the medical specialists' work more closely with alternative care workers'; it would promote better communication on *every* case, because medical specialists would be working side by side with JCDFS workers; it should promote a more consistent message to foster parents (because medical care specialists and JCDFS staff would be working together); and over time it should provide JCDFS workers with more awareness of health care needs and resources.

The Oversight Committee's recommended approach, or some other alternative design, should be piloted.

An on-site capacity to provide each child with a complete medical examination written 24 hours of entering care (or in other emergency situations) would be developed at JCDFS, with appropriate medical personnel.

- Contracts with existing providers would be renegotiated, revised, or cancelled, to reflect the revised program model, no later than June, 1995.

 *Under no condition should the current contracts be renewed without having a complete redesign of the service model.*

- The approximately 300 children in alternative care who are identified as being seriously ill and/or have chronic physical and/or mental health problems should be enrolled in a comprehensive managed/coordinated health care plan. This aim is to ensure intense medical oversight for these children's needs, when that cannot be provided by the basic care planning for children. (If the Oversight Committee can develop an option for these children that assures the same type of guaranteed coverage as a managed

care option, that could be considered rather than this recommendation.)

- For the remainder of this year, while the program model is being redesigned, there should be mandatory joint training of social service workers and medical care case managers. In the future, if the above approach is adopted, there would be joint training of alternative care workers and the medical specialists.

The Oversight Committee identified in Recommendation # 25 should be charged with the responsibility for recommending changes in the Alternative Medical Care Plan to the program model suggested above or another comprehensive approach to hands-on medical care case management. A new approach to the Alternative Medical Care Plan should be ratified by June, 1995, so that it can be pilot tested and then reflected in contracting arrangements for the next contract year.

2. Develop any contract arrangements necessary to implement the new approach for all children in JCDFS custody. (no later than January, 1996)

*Recommendation # 28:* Assure that the pre-service and on-going training includes mandatory joint training for alternative care social service workers and medical care case managers.

Training in this area shall focus on:

- the role and functions of medical care case managers (or medical specialists);
- the responsibilities of social service workers in arranging for and transporting children to medical appointments;
- the responsibilities of foster parents in identifying medical care needs, carrying our medical plans of care, and arranging for and transporting children to medical care appointments;
- how to identify health and mental health needs of children;
- accessing medical care resources in the community; and
- how to advocate for children in the worker's caseload.

Description of Tasks and Products:

1. Identify a small workgroup composed of the DFS Medical Care Coordinator, a representative from the Training and Staff Development Unit, and representative foster care staff and medical care case management staff to develop a training outline and materials.

2. Schedule the joint training beginning in June, 1995 so that all current staff are trained by December, 1995.

3. Thereafter, include the training as part of the pre-service and on-going curriculum for all newly hired workers and supervisors.

4. Medical Care Case Managers should be required to participate in this training and other parts of the DFS pre-service training curricula.

*Recommendation # 30:* By December, 1995, automate selected JCDFS management functions in order to increase productivity immediately and begin building a base for a more completely automated office.

Description of Tasks and Products:

1. Agree among JCDFS management and staff, and with state DFS, on the priority areas for automation in the short-run. (Completed) The Panel suggests: placement, licensing, and foster parent training.

2. Engage a design consultant (possibly the MIS Mentor) who can assist in the design and development of all three activities. (December, 1994)

3. Establish small working groups to advise the design consultant, and establish general timelines for completion of the work. (December, 1994)

4. Develop system design for each of these three applications. (June, 1995)

5. Develop computer training for all staff, and particularly for staff most directly affected by the priority areas for automation (June, 1995)

6. Implement and revise applications, with the end product being trouble free operation of each. (December, 1995)

*Recommendation # 31:* By January, 1995, begin development of a system of full automation (an "automated office") in Jackson County as a model for the state.

Description of Tasks and Products:

1. Obtain State DFS and DSS commitment to proceed with Jackson County as prototype of automated office. (Completed)

2. Prepare and advance budget request for design and initial pilot operation of model automated system in Jackson County, building on Governor's theme of reinventing government. (December, 1994)

3. Select design consultant for work with JCDFS. If possible, begin this work in FY'94, even though the bulk of the design work will be completed in FY'96. (December, 1994)

4. When funds are secured for design of the larger system, develop a design process involving local and state staff (management and frontline) as well as required consultants and the mentor in this area. (June, 1995)

5. Conduct the design process, and implement early phases of automated system as feasible. (December, 1995)

*Recommendation # 34:* By June, 1995, develop a framework and workplan for a comprehensive quality assurance program which can be incrementally implemented over the next two years.

Description of Tasks and Products:

1. By December, 1994, identify and begin working with a Mentor who can provide consultation during the period from December, 1994—June, 1995, on the framework, organizational structure, staffing, qualifications, training, and functions of the Quality Assurance Unit in JCDFS. In addition, the Mentor will be available to assist Jackson County DFS staff in preparing protocols for program specific quality reviews (see recommendation below).

2. By June, 1995, prepare a report describing the conceptual framework and operational plan for a comprehensive Quality Assurance system in the Office of the JCDFS.

3. The framework and workplan shall be developed in conjunction with the monitoring methodology for the Consent Decree and Operational Guide. The Quality Assurance Unit shall develop the capacity to assume the monitoring function.

4. Feedback reports shall be prepared for workers and supervisors within 30 days of the completion of any quality review.

5. Semi-annual reports shall be prepared which aggregate information from reviews conducted by the Quality Assurance Unit, independent from those conducted by the *G.L.* Monitoring Committee, to identify systemic problems and make recommendations on training and other strategies to correct those problems.

*Recommendation # 36:* By September, 1995, ensure that information from Quality Assurance Reviews is reflected in JCDFS training.

Description of Tasks and Products:

1. Develop procedures so that individual workers or supervisors for whom a quality review identifies problems are referred for specialized training and supports.

2. The Training Unit should keep data on those workers and supervisors referred for specialized training and follow-up to ensure that the requisite training has been provided and completed within three months of referral.

3. Assemble aggregate information from quality reviews and transmit it on a quarterly basis to the Training Unit for the development of training initiatives to remedy problems identified thorough quality reviews.

*Recommendation # 37:* By December, 1995, conduct specialized studies and/or reviews to focus on emerging needs or problems.

The Quality Assurance Unit should have the capacity to carry out several specialized reviews during the course of a year, targeted to identified problem areas or emerging needs. For example, a specialized review of children with multiple placements could be conducted to identify the specific reasons for continued replacement and recommend plans of corrective action. Another area in which specialized reviews might be helpful the cases of children who have had a goal of return home for more than 18 months without progress. The QA Unit might do a series of in-depth case studies of some of these children and families to identify systemic barriers to reunification and propose remedies.

Description of Tasks and Products:

1. By July 1 of each year, JCDFS management and QA staff shall reach agreement on special studies to be carried out during the next fiscal year. During the next two years, the studies should focus on areas of particular importance for implementing DFS priorities.

2. QA staff shall develop the methodology and workplan for conducting agreed upon studies.

3. The studies shall be carried out in accordance with the methodology and workplan, utilizing outside contract resources as necessary. Findings and recommendations should be made available to all management staff. Plans of action for implementing changes based on the recommendations should be developed.

*Recommendation # 41:* By June, 1995, implement an effective risk assessment/decision-making framework to guide and support workers' decisions. This shall be part of a process to develop a common family-based assessment and case planning approach for use by all JCDFS units.

Description of Tasks and Products:

1. Establish an internal working group with State DFS and community participants, to develop a risk assessment methodology. (December, 1994)

2. Contract with a consultant to advise on risk assessment tools and decision mak-

ing support systems. (The mentor selected for Intake and Investigations may be able to provide the necessary expertise.) (December, 1994)

3. Review at least three alternative risk assessment procedures and select an approach. (March, 1995)

4. Conduct training on the selected model for all DFS children services units and appropriate community agencies. The training shall include family-based service methodologies. This task will be incorporated into the overall pre-service and in-service training plan for DFS. This section applies to those workers and supervisors covered by Consent Decree Section V.A. (June, 1995)

5. Institute a process to begin developing a common family-based assessment and case planning approach across all JCDFS units. This section applies to those workers and supervisors covered by Consent Decree Section V.A. (June, 1995 and on-going)

*Recommendation # 42:* By December, 1994, strengthen and support workers' decision-making through improved supervisory practice and expanded use of multidisciplinary teams. This section applies to workers and supervisors covered by Consent Decree Section V.A.

Description of Tasks and Products:

1. Supervisors shall hold regular unit meetings, no less frequently than once every two weeks. (On-going)

2. Staff shall participate in multidisciplinary teams, in order to ensure more comprehensive decisions informed by multiple professional perspectives. (On-going)

3. Secure clinical (psychosocial) consultation through one or more contracts with local professionals. (December, 1994)

*Recommendation # 43:* By December, 1994, establish new procedures for impartial review and prompt follow-up to reports of abuse and neglect or inappropriate discipline in alternative care settings.

Description of Tasks and Products:

1. State DFS has established a central, state-office-supervised Out-of-Home Investigation Unit to conduct investigations in alternative care settings. (Complete)

2. Establish a team which ensures a multi-disciplinary approach to issues of licensing and service needs of the child and family. Team should include representatives from the investigation, alternative care and licensing units. Foster parents, CASA, Family Court and Legal Aid shall also be on the team. (December, 1994)

3. The team shall review the results of the investigation and make recommendations regarding the following: service needs of the child victim, including a review and evaluation of the current placement; and services for the foster family, including a review and evaluation of existing and future placements in this home. Team decisions/recommendations shall be made in writing and forwarded to the Program Administrator for Children's Services who has final authority. (December, 1994)

4. The team shall develop written policies and procedures regarding process, criteria for decision-making, time frames, and recordkeeping. (December, 1994). Policies will include the following items:
 • Reports determined as "probable cause" (substantiated) or "unsubstantiated but preventive services indicated" will be reviewed by the team.
 • Facts surrounding the incident and the team's report and recommendations (with disagreements and as modified by PACS) shall be sent to the child's worker, child's GAL, placement unit, members of the team, Family Court, and copies placed into the child's record and the foster parent record.

5. DFS shall establish a monitoring mechanism to ensure follow-through on decisions made by the PACS. (December, 1994)

6. Conduct training. Jackson County DFS shall ensure that intensive training is provided to staff, foster parents and

community agencies (including the Jackson County Family Court and its GAL units) on the above-cited policies and procedures. This task will be incorporated into the overall DFS pre-service and in-service training plan. (March, 1995)

*Recommendation # 52:* By September, 1995, complete provision of a greatly expanded training program for all alternative care workers to increase their skills in all aspects of permanency planning, as well as their ability to match children's needs to appropriate resources.

Description of Tasks and Products:

1. Small workgroup of JCDFS staff and state staff (using National Panel list of recommended content) develop specifications for training to provide more comprehensive and concrete skills in permanency planning, including integration of this training with core training expectations. (December, 1994)
2. Agreement on method for providing training. (December, 1994)
3. Training completed. (December, 1995, and on-going)

*Recommendation # 53:* By December, 1994, and concurrently with design of the training, strengthen JCDFS' approach to permanency planning, ensuring that it incorporates a family centered planning, service delivery and decision making process which begins at the point of placement and attempts to resolve family problems through the provision of intensive service.

Description of Tasks and Products:

1. Develop a practice guide and standards for the provision of permanency planning services which articulates the values and principles that guide service delivery and specifies the following:
 - a case planning process that is developed collaboratively between birth families, foster families, and the worker;
 - a case planning process that is based on prompt and comprehensive assessments of the child's and birth family's service needs.
 - a focus on family strengths and family empowerment;
 - immediate initiation of the case planning process at the point of a child's entry into foster care;
 - a placement review conference to determine if placement is necessary and/or what immediate steps can be taken to reunify the family;
 - an intensive need based intervention strategy;
 - provision of information to parents about permanency planning and the importance of resolve the problems that brought the child into care;
 - an accountability mechanism to assure the implementation of the policies;
 - criteria for the establishment of various permanency goals;
 - clear definition of the minimal services that must be provided to birth parents as it relates to reasonable efforts to prevent placement and to reunify families; and
 - guidelines for expedited permanency planning for children with little likelihood of returning home; *e.g.,* abandoned infants, children whose parents have killed other children, parent with severe mental and/or developmental delays. (December, 1994)

In addition, specific standards governing case planning written service agreements and permanency planning activities should be developed so that supervisory reviews and quality assurance activities can make use of these standards.

2. On an interim basis, develop a policy memorandum which clarifies the roles and responsibilities of the caseworker, professional evaluation team (PET) and the permanency planning review team (PPRT) in the development and implementation of the case plan so that the primary responsibility for the development of the case plan rests with the worker and the family, with review authority vested in the PET and PPRT. (December, 1994)

*Recommendation # 54:* By June, 1995, establish a placement unit with a minimum of two staff, and with adequate computerized information, as well as methods for maintaining current information about available placement resources.

Description of Tasks and Products:

1. Develop a plan for staffing the placement unit (December, 1994) which defines the roles and functions of the unit and provides initially for a minimum of:
 - 2 staff for placement selection; and
 - 1 clerk.
2. Get authorization for additional positions. (December, 1994)
3. Recruit, train, and hire staff for Placement Unit. (March, 1995)
4. Ensure that unit has access to automated information support system. (June, 1995)
5. Redesign placement process, in light of automation, and reassess staffing needs. (On-going)

*Recommendation # 55:* By March, 1995, JCDFS shall arrange greater worker access to evaluative resources at the time of placement so that a more comprehensive assessment of the child's characteristics and needs can be obtained more rapidly.

Description of Tasks and Products:

1. Assess the quality and quantity of resources for evaluating needs of children entering care. (December, 1994)
2. Set priorities for contracting for needed resources and create small pool of available dollars for use by workers to purchase needed services. Workers shall be given written procedures and training how to easily access Medicaid funded diagnostic and evaluative services and why such access is important. (March, 1995)
3. Contact local Coalition for Positive Family Relationships for access to its resources and its computerized resource directory. (Complete)

4. Provide each direct service worker with a directory of public and private community resources and current Medicaid providers who will serve children and families which can be used in behalf of foster children and their families. Update the resource directory annually. (March, 1995)

*Recommendation # 56:* By June, 1995, to provide greater order, consistency, and accountability for the placement process, JCDFS shall develop and implement policies, procedures, and practice standards to guide workers' decisions related to placement (consistent with the *G.L. v. Stangler* Order).

Description of Tasks and Products:

1. Identify areas where practice guides and standards are needed, including, but not limited to the following areas (December, 1994):

 a. Placement in conformity with the licensing process and the foster parents' expressed preferences;

 b. Placement in conformity with the requirements of the Consent Decree and the Court's December, 1992, Order, particularly those standards requiring pre-placement visits;

 c. Placement in compliance with the Consent Decree's requirements on preventing overcrowding in the foster home; and

 d. Social services worker supervision of the placement according to the Consent Decree's requirements, particularly with regard to his/her making in-person visits to the child in the foster home.

2. Complete practice guides and standards, issue to workers and train workers on their use. (June, 1995)

*Recommendation # 58:* Over three years, dramatically expand professional-level foster home resources for children with emotional and behavioral problems with the goal by the end of FY '96 to have approximately one-quarter of the system's placement resources in this category and 40 percent (40%) by the end of the following fiscal year.

Description of Tasks and Products:

1. Communicate clear policies related to behavioral foster homes and career foster homes, so that workers understand differences between them and criteria for placement (December, 1994)

2. Consider issuing RFP's for private agencies to recruit, develop, train, and supervise career foster parents. (December, 1994)

3. Recruit and train the additional homes that will be supervised directly by JCDFS staff. (December, 1994—December, 1995)

4. Based on an assessment of the needs of children coming into care, reassess the Panel's goal (related to 40% of slots above) and set program and budget goals for FY'96 and FY'97. (June, 1995)

5. Have all 50 additional professional-level foster homes developed, trained, and accepting children. (December, 1995)

*Recommendation # 59:* DFS shall continue implementation of a special reunification effort designed to move children out of alternative care and return them to their homes.

*Recommendation # 60:* Develop and implement a "wraparound" service program to address the needs of seriously emotionally disturbed children, including children who are returning to their communities from residential treatment. Service capacity for 25 children shall be developed by September, 1996, with on-going assessment of the additional number of children who require this service as an alternative to residential treatment.

Description of Tasks and Products:

Recommendation 60 relates to new priority services to be developed in order to provide an appropriate range of out-of-home care. The process of resource development involves:

1. Developing a workgroup (made up of internal staff and representatives from community agencies) to identify the needed volume of service and recommend a service model. In some instances, the workgroup will have some local practice on which to build. However, the workgroup will also need to develop program design using best examples available from other jurisdictions.

2. The workgroup will establish multiple year goals for service volume in each service area because all of these services should reach substantial parts of the child/family population. The Panel has made initial recommendations for service volume; these should be regarded as minimums.

3. The workgroups, with consultation, will develop detailed service designs for each service, for review and approval by DFS management staff at the county and state levels.

*Recommendation # 61:* By December, 1994, implement special, intensive recruitment and placement efforts for the over 300 children whose goal is adoption, with a goal of having Petitions for Adoption filed for 150 class members between July 1, 1994, and December 31, 1995.

Description of Tasks and Products:

1. Contract with one or more adoption exchanges or adoption placement agencies to assure more comprehensive recruitment of adoptive homes. (Complete)

2. Review foster homes now caring for these children and determine if foster parents are suitable adoptive parents and are interested in adopting. Review should be expeditiously completed for all waiting children, approximately 300. (December, 1994)

3. When appropriate, explore adoption with foster parents of these children. (December, 1994, and on-going).

4. Continue individualized recruitment for each child, using exchanges as well as local and regional child-specific recruitment. (On-going)

*Recommendation # 62:* Conduct special training immediately related to determining who is adoptable and on the techniques and skills needed to discuss these issues with children. Ongoing training on these topics

also shall be incorporated into JCDFS' regular staff training program.

Description of Tasks and Products:

1. For training of adoption staff and alternative care staff in the next three months, contract with a specialist in adoption (with extensive public sector experience) who will provide staff with intensive training in the decisions surrounding effective adoptions. A key issue in training will be to identify *all* children who can be successfully adopted as well as other decisions involved in preparing children for adoption, deciding when to change the child's goal to adoption, etc. The training should be open to the Family Court staff and GAL units. (Training to begin by December, 1994)

2. For longer term training, JCDFS adoption and training staff shall jointly review pre-service and in-service training and add new materials related to the issues identified during the Panel's review. The mentor who works with the adoption staff should play a lead role in this task. (New material shall be incorporated into the pre-service and in-service training by June, 1995)

*Recommendation # 63:* Improve the foster parent adoption program in many ways, including increasing community and foster parent understanding of the program, with the goal of achieving more adoptions through foster parents.

Description of Tasks and Products:

1. Write policy and guidelines and conduct training for both staff and foster parents regarding criteria and procedures for foster parent adoptions (who is eligible and how to handle this issue during foster parent recruitment and training). (June, 1995)
 a. These policies and guidelines should include direction and guidance in making transracial foster and adoption placements.

2. Guidelines shall include consideration of every foster care placement as a po-

tential adoptive home. (December, 1994)

3. Train staff to provide separation counseling for foster families whose foster children are placed in adoptive families. (June, 1995)

4. Issue policies that clarify for staff and community that recruitment of an adoptive home for a child can and will begin before TPR is finalized. (A formal directive ending the current prohibition against doing specific recruitment for a "legal risk" child shall be issued.) (December, 1994)

*Recommendation # 64:* By March, 1995, improve the preparation of children for adoption.

Description of Tasks and Products:

1. JCDFS will define the expectations for alternative care workers (with the assistance of foster parents) to collect and write up needed information on children to be placed and develop practice guidelines on working with children and dealing with questions about circumstances of adoptive placement and future plans/issues. (December, 1994)

2. Amend the handbook for parents with children in out-of-home care to include the joint agency/parent responsibility to do permanency planning. (December, 1994)

3. All cases of foster children with a high probability for adoption will be tracked by the management information system and targeted for quick decision by the PPRT (March, 1995)

*Recommendation # 65:* By December, 1994, the screening and application process for prospective adoptive parents shall communicate information about the children available for adoption, so that parents who are not interested do not continue into the process.

Description of Tasks and Products:

1. Contract with an adoption exchange to teach staff how to make a recruitment plan for every waiting child and help develop the yearly calendar. (Underway)

2. Contract for adoptive parent recruitment for specific children.
3. Develop recruitment methods. Staff need to develop, on a regular basis, materials describing the children waiting to be adopted and marketing them to prospective adoptive parents. This publication needs to be updated and disseminated on a regular basis to a mailing list of prospective adoptive parents and people who are likely to come into contact with potential parents. In addition, staff may wish to recruit a group of adoptive parents who would volunteer to answer questions from adoptive applicants. (December, 1994)
4. Develop a screening and application process geared to separate out quickly those parents uninterested in and unsuited to DFS children. All staff, up to and including administration, must be clear that the central adoption mission of the agency is to provide families for its waiting children and not to do home studies for all applicants who want home studies. Written materials for adoptive parents shall state this clearly. Orientation and preparation of parents should include situations where the prospective parents can meet and interact with the types of children available for adoption and experienced adoptive parents. Preference for home studies should only be given to those families that express an interest in waiting DFS children. DFS may also wish to consider charging a fee for anyone who, after the fact, wants to use the home study for an inter-county adoption. (December, 1994)

*Recommendation # 67:* By December, 1995, implement the administrative supports necessary for the effective operation of the adoption program, including increased training and staff development, adequate staffing levels, automated case tracking, and development of needed policy and manual materials.

Description of Tasks and Products:

1. Develop and implement short-term and long-term training. Develop a short-term training plan to familiarize staff with the essentials of adoption practice. A long range training plan which incorporates essential adoption training into the ongoing training of the agency should also be developed based on a yearly individualized development plan for each adoption staff member outlining the areas of skill and knowledge to be expanded and specifying how this will be accomplished. (March, 1995)

The Panel has identified several possible consultants who can train on speeding up permanency planning decisions as well as on the topic of who is adoptable and how one makes those decision. A contracted adoption exchange can train staff on recruitment techniques and recruitment planning. The state office should also consider having an Adoption Leadership Institute in Missouri for its key staff. Jackson County may wish to develop with LINC a scholarship program to pay for staff to attend the North American Council on Adoptable Children (NACAC) conference and/or Family Builders Conferences. (Title IV–E funding should be available to help pay for these costs.)

2. Explore divesting JCDFS of the responsibility to do court-ordered investigations and use the staff time gained to place its own children. The first step is to determine if this action is within state policy guidelines and secure amendments if necessary. Next, the County must determine if private agencies are willing to undertake this service. If so, it should work out a written agreement with the Court. (December, 1994)
3. Develop a case tracking system for children and adoptive families as well as a data keeping system for the adoption program to ensure and monitor that the Court–Ordered timelines for adoption recruitment and matching are done leading to timely placement with an adoptive family. To do so, JCDFS should review case tracking and review systems used by comparable jurisdictions (*e.g.,* Louisville, Kentucky) and select one that fits local needs. The tracking and data collection system should become part of the overall one being developed by the agen-

308

cy. (December, 1995, for development of specifications for what is required in an adoption tracking system)

4. Improve the policy manual and keep it up to date by hiring a consultant to work with one new staff member and one experienced staff member to determine the problems with the existing manual and design and create a new one. The team should identify gaps in policies (*e.g.*, transracial adoptions; legal risk recruitment and placement) that need to be filled in by senior officials, and request that they do so where feasible. It should also solicit ideas from staff members on how to design the manual to make it user-friendly. It should then reformat the manual. Jackson County needs also to institute a process to ensure that the manual is kept up-to-date. (December, 1994)